THE W. J. SCHOLL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67079. Promulgated June 21, 1934.

*W. A. Mason, Esq.*, and *A. M. Henderson, Esq.*, for the petitioner. *Arthur Carnduff, Esq.*, and *F. S. Gettle*, for the respondent.

OPINION.

MORRIS: The respondent having determined a deficiency in tax of $3,643.05 for the calendar year 1930, the petitioner brings this proceeding for the redetermination thereof, alleging as error in such determination the respondent's failure to adhere to sections 41 and 42 of the Revenue Act of 1928, and certain articles of Regulations 74 promulgated thereunder, hereinafter set forth. Specifically, the question for consideration is whether or not the income from certain contracts was taxable in the year 1930, as the respondent has held, or in 1931, as the petitioner contends.

The petitioner is a corporation, with its principal office in Youngstown, Ohio, where it is engaged in the installation of heating, plumbing, ventilating, and power plant systems.

The petitioner entered into a contract on April 16, 1929, to install a complete heating and ventilating system, including boilers, radiators, piping, and plumbing in the Central Bank Building at Youngstown, Ohio, which contained the following clause:

Guarantee. This contractor shall guarantee his work generally for a period of two heating seasons after the acceptance of the work; ordinary wear and tear excepted, but not releasing him from return trap repairs.

Should imperfections develop due to faulty workmanship during the above period, this contractor shall repair same in a proper and satisfactory manner to the architect, without cost to the owner.

It entered into a contract with the school district of Sharon, Pennsylvania, on June 25, 1929, for the installation of boilers, stokers, ventilating equipment, unit heater for class rooms, and temperature regulation, in the Sharon Junior School Building, which contained the following clause:

Guarantee: All labor and materials shall be guaranteed in writing for one year against all defects, except such as are due to wear, neglect and bad management of the plant. The contractor shall guarantee the free circulation of steam throughout the entire system, without noise or hammering, and that the operation of the motors and fans will be reasonably free from noise. He shall furnish all necessary instructions and make all adjustments required to develop the full capacity of the apparatus and to warm the building in accordance with the requirements of the plans and specifications, without undue strain or excessive length of time, provided that the heating and ventilating apparatus is in continuous operation and all doors, windows and other openings are tightly closed; also that the ventilating system will provide at least 50 cubic feet of fresh air per minute for each pupil accommodated, in accordance with the requirements of the Pennsylvania State Code.

All defective material, as mentioned above, shall be repaired without extra charge by the contractor. . Any radiators, coils, etc., failing to circulate properly, or piping or equipment showing leaks, shall be altered, remodeled or changed until same performs properly, without charge by the contractor.

The contractor shall keep the entire plant in proper operative adjustment and condition for one year following its completion without charge. Natural wear, accident, or carelessness on the part of others, however, shall not be made good by this contractor. All machinery shall be left in successful operation and adjusted to its work on the most economical basis.

It entered into a contract on August 10, 1929, to furnish and install a boiler plant, plumbing, heating, and ventilating equipment in the Niles Trust Co. Building, which contained the following clause:

When the herein specified apparatus is wholly completed, the heating contractor shall guarantee same for a period of one year after date of completion; that the work is installed in accordance with the plans and specifications; that vapor will circulate freely to all radiators, and that the plant is free from leaks or defective materials.

All of the petitioner's contracts contained guarantee clauses similar to those above, some of which are for the period of one year and others for two years, under which it conducts periodical inspections, and where faulty material or workmanship is discovered proper replacements or repairs are made. In some cases the actual expenditures for material and labor in connection with such guarantees have been very small, but in other instances they have amounted to as much as 25 percent of the contract. For instance, in the case of the Sharon School contract it was required to install additional radiation and temperature regulation.

The work upon the three contracts aforesaid was begun in April, July, and October, 1929, respectively, and final payments were received thereunder in the respective months of March, December, and October, 1930. The petitioner incurred direct expenses and apportioned the following indirect expenses against the several contracts during the guarantee period:

| Name of contract | Overhead expense during maintenance and guarantee period | Direct expenditure during maintenance and guarantee period | Total expenses during guarantee period |
|---|---|---|---|
| Central Bank | $3,652.95 | ............ | $3,652.95 |
| Sharon School | 3,143.97 | $664.54 | 3,808.51 |
| Niles Trust Co | 929.86 | 389.99 | 1,319.85 |

No direct expenses were incurred under the Central Bank contract during the guarantee period. The entire $389.99 charged against the Niles Trust contract was incurred in 1930 so that, with the exception of the $664.54 charged against the Sharon School contract, there were no other direct expenses incurred beyond the taxable period in which final payments were actually received under the contracts. The amounts charged against the several contracts as " Overhead expense during the maintenance and guarantee period " represent an arbitrary percentage of general overhead chargeable against the entire business. To the $665.54, direct charges above, should be added $38.70, premium paid by the petitioner for a bond to insure faithful performance under the guarantee provisions of the Sharon School contract covering one year of the two-year period of guarantee.

Prior to 1922 the petitioner set up a reserve from year to year to provide for expenses arising under the " guarantee " clause of its contracts. In or about that year it was required by the Bureau of Internal Revenue to change to the method of accounting now employed, i.e., computing and recording profits upon contracts at the termination of the maintenance or " guarantee " period.

At the completion of the contracts aforesaid the petitioner had no means of determining what the actual cost of the installation and compliance with the " guarantee " clauses therein or the actual net profits therefrom would be.

In its return for the taxable year 1931 the petitioner deducted $27,424.25, composed of $13,485.80, $8,366.86, and $4,729.08, plus $842.51 not here in controversy, representing the profits from the three contracts here considered, together with the amount not in controversy, which apparently, though the record is not positive in this respect, had been included in the gross income for that year.

The deduction was accompanied by the following explanation: "Amount of profit realized on contracts closed out in 1931 which was considered as 1930 taxable income by Revenue Agent at time he examined 1930 return." Such amount was not, however, included in the gross income in the petitioner's return for 1930, the year in which the respondent contends it should be included. Nor was it carried upon the petitioner's books as a profit in that year.

So much of sections 41 and 42 of the Revenue Act of 1928 and the articles of Regulations 74 promulgated thereunder as are pertinent hereto and are relied upon by the petitioner are as follows:

SEC. 41. The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayers; * * *

SEC. 42. The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period.

ART. 331. *When included in gross income.*—Gains, profits, and income are to be included in the gross income for the taxable year in which they are received by the taxpayer, unless they are included as of a different period in accordance with the approved method of accounting followed by him. (See articles 321–323.) * * *

ART. 321. * * * The time as of which any item of gross income or any deduction is to be accounted for must be determined in the light of the fundamental rule that the computation shall be made in such a manner as clearly reflects the taxpayer's income. * * *

ART. 334. *Long-term contracts.*—Income from long-term contracts is taxable for the period in which the income is determined, such determination depending upon the nature and terms of the particular contract. As used herein the term "long-term contracts" means building, installation, or construction contracts covering a period in excess of one year. Persons whose income is derived in whole or in part from such contracts may, as to such income, prepare their returns upon the following bases:

*        *        *        *        *        *        *

(b) Gross income may be reported in the taxable year in which the contract is finally completed and accepted if the taxpayer elects as a consistent practice so to treat such income, provided such method clearly reflects the net income. If this method is adopted there should be deducted from gross income all expenditures during the life of the contract which are properly allocated thereto * * *.

ART. 322. *Bases of computation.*—Approved standard methods of accounting will ordinarily be regarded as clearly reflecting income. * * *

ART. 323. * * * each taxpayer shall adopt such forms and systems of accounting as are in his judgment best suited to his purpose. * * *

The respondent, as we have stated, has determined that the profits from the three foregoing contracts were taxable in 1930, the year in which final payment of the several considerations thereunder were

received. We begin, therefore, with the presumption that such is the correct method to be employed.

The petitioner contends that (a) the contracts here in question were not completed until the taxable year 1931; (b) that its return for the taxable year 1930 clearly reflected the true net income for that year; and (c) that the respondent had approved its method of accounting for approximately eight years.

It should be pointed out at this juncture that this is not a case where the subject matter of the contracts had not been completed within the taxable year and where it is sought to postpone the reporting of profits until such completion. The contention here is that, although final payments under the contract were received within the taxable year for the performance of the subject matter thereunder, the contracts themselves were nevertheless not completed until the periods of the guarantee clauses expired. It is to be doubted whether the respondent's regulations governing "long-term contracts" were intended to cover, not only the performance of the subject matter of the contract itself, but also the incidental or collateral functions which may or may not arise thereunder—depending upon future necessity—by reason of an expressed or implied guarantee. At any rate it would seem reasonable to say that his regulations contemplate that a completion of the subject matter of the contract constitutes substantial performance thereof and is a completion of that contract within the meaning of his regulations. So that, in any event, his regulations, do not support the position which the petitioner takes, that although the subject matter was completed and full payment received in 1930, the reporting of profit must be postponed because of the possibility or probability that further costs may be incurred. *Vang* v. *Lewellyn*, 35 Fed. (2d) 283.

The petitioner's first contention relies primarily upon the fact, as the testimony shows, and as we have found, that the "actual" cost, hence the "actual" profit, under a given contract can not be determined until the expiration of the guarantee period. This is easily understood, but in the administration of the taxing statutes, while it is highly desirable that accuracy be stressed and, indeed, insisted upon wherever the exigency will permit, those charged with the administration thereof, in the great majority of cases, must be satisfied with substantial accuracy, since the "actual" determination of profit or loss, where every element is given full effect, is seldom possible if the accounting therefor is at all complex. So that it might be said that this is merely another of the manifold accounting problems to be considered in determining whether or not

the chosen method clearly reflects net income or whether some other method should be substituted.

We fully appreciate, as the petitioner contends, that its consistent practice over a period of years should be strongly considered, especially where the respondent has impliedly approved that method by his failure to reject it; but if we find that the method so adopted was incorrect and does not, within the taxable year, clearly reflect net income, we must correct rather than perpetuate the error. See *R. G. Bent Co.*, 26 B.T.A. 1369.

Circumstances closely paralleling those of the instant case are to be found in *Vang* v. *Lewellyn*, *supra*, in which the court held that the method of accounting there employed—wherein the reporting of profits from construction contracts was postponed until the end of the maintenance period—did not correctly reflect income for tax purposes. The plaintiff in that case was engaged in the road construction business under contracts requiring installment payments as work progressed. Generally, the construction work was finished within the year, but in some instances it extended into the following year. When work was finished and the final installment under the contract paid, the company deducted all expenditures made from the total receipts in the determination of profit or loss and, by reason of the fact that it was required, at its own expense, to maintain the road free of all defects for a period of five years after completion, it further reduced the amount so received by an estimated amount of the probable maintenance cost and reported the difference as taxable net income for the year the work was finished. The respondent rejected this method and disallowed the estimated reserves as deductions. Whereupon the company filed amended returns by which it sought to establish its accounts on the basis of completed contracts, representing that a contract was not completed until the end of the maintenance period, and it reported its income from the contract as having been received at that time. The court observed that the method used was entirely lawful, "but for tax purposes it was not lawful unless it clearly reflected income," and it finally said:

* * * We hold that, when the construction work was finished and the contract price paid and the road turned over to the city or county, the contract was completed, disclosing definitely gain or loss in the transaction. This was how the company itself first regarded it when it made and set aside estimated reserves to cover costs of maintenance on its many contracts and then claimed them as deductions from income received in the year the transactions came to an end by payment and delivery. The company's engagement to maintain the work in good condition for five years after completion as a pledge of its workmanship was clearly a contingent liability which might or might not cost money—it occurred in only 3 out of every 12.5 jobs—and, accordingly, might or might not reduce the net income from a contract closed by final payment long before. Costs of maintenance, if any, would of course

be a subject for reduction from income in the year in which income was received, but such costs, having no effect upon or relation to the final payment of the contract price at the end of the work, would not keep the contract open and postpone payment of the tax on the income received.

Except for the amounts of indirect expenses apportioned to these contracts on an arbitrary basis—which might have been, but which were not, supported by a showing of the amount of indirect labor actually expended upon each project—the expenses incurred during the guarantee period were comparatively insignificant. It would be a gross distortion of net income to say that the taxability of the $26,582.74 received upon these three contracts, subject to its unfettered use, should be postponed until the following year by reason of a purely contingent possibility that the petitioner might be compelled to expend some further amounts in order to satisfy an incidental requirement under the contract.

We are of the opinion that the respondent properly rejected the petitioner's method of accounting and that his determination should be approved.

*Judgment will be entered for the respondent.*