FORT PITT BRIDGE WORKS v. COMMISSIONER OF INTERNAL REVENUE.
Nos. 5036, 5042, 5043.

Circuit Court of Appeals, Third Circuit.
Oct. 2, 1937.
Rehearing Denied Dec. 1, 1937.

Leonard K. Guiler, of Pittsburgh, Pa., and Charles D. Hamel and John Enrietto, both of Washington, D. C., for petitioner.

Robert H. Jackson, Asst. Atty. Gen., Sewall Key and John G. Remey, Sp. Assts. to the Atty. Gen., and F. E. Youngman, of Washington, D. C., for respondent.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

These cases are here on petition to review orders of redetermination of the United States Board of Tax Appeals involving income and profits taxes of the petitioner for the years 1917, 1918, and 1919, arising out of a contract for the material for 21 hangars of the dimensions of 110 feet x 160 feet to be invoiced at 5.7 cents per pound. The proceedings for all three years were consolidated.

Three questions are involved in this case:

1. Was the petitioner entitled to a special assessment? The petitioner says that the Commissioner and Board of Tax Appeals erred and abused their discretion in not allowing it to have its taxes for 1917 determined by a special assessment under section 210 of the Revenue Act of 1917 (40 Stat. 307), and for the years 1918 and 1919 under sections 327 and 328 of the Revenue Act of 1918 (40 Stat. 1093).

Profits taxes for those years were ordinarily computed in accordance with section 201 of the Revenue Act of 1917 (40 Stat. 303), or section 301 of the Revenue Act of 1918 (40 Stat. 1088), on the basis of specified percentages of the invested capital of the corporation as determined under section 207 of the Act of 1917 (40 Stat. 306) or section 326 of the Act of 1918 (40 Stat. 1092).

If, however, the Secretary of the Treasury is unable satisfactorily to determine invested capital, or if the taxpayer, as here, makes application for special assessment for the years 1918 and 1919, and the Commissioner finds that he comes within one of the classes enumerated in section 327 of the Act of 1918, then he may be assessed for those years under section 328 of that act. If the taxpayer is entitled to a special assessment, the tax will be the amount which bears the same ratio to the net income of the taxpayer for the taxable year as the average tax of representative corporations engaged in a like or similar trade or business bears to their average net income for such year.

The petitioner contends that it is entitled to a special assessment because of abnormal conditions affecting its capital and income. The Board summarized the alleged abnormal conditions as follows:

"1. Valuable assets received from a predecessor partnership have not been and can not be considered in computing invested capital.

"2. Old design, drawings and patterns of great value have not been and can not be considered in computing invested capital.

"3. Due to an improper accounting system known as the completed contract method, the reporting of profits has been delayed one year with a consequent reduction of surplus, but it is now impossible to reconstruct a proper surplus on a proper accrual basis.

"4. The bookkeeping system has resulted in certain abnormalities such as (a) the deferring and shifting of income; (b) the inflation of current income caused by an incorrect method in the stock steel account, and (c) inaccuracy in income due to the absence of a proper work in process inventory."

The burden was on the petitioner to produce evidence that would entitle it to a special assessment. After a full and fair hearing and consideration of the evidence, the Board found that the petitioner had failed to establish such abnormal conditions, or irregularities, in capital or income, as would entitle it to a special assessment. There was no hint of any fraud. Under these circumstances the conclusion of the Board is final and cannot be reviewed by this court. Cramer & King Co. v. Commissioner (C.C.A.) 41 F.(2d) 24, 26; Duquesne Steel Foundry Co. v. Commissioner (C.C.A.) 41 F.(2d) 995; Blair v. Oesterlein Co., 275 U.S. 220, 48 S.Ct. 87, 72 L.Ed. 249; Williamsport Co. v. United States, 277 U.S. 551, 48 S.Ct. 587, 72 L.Ed. 985; Heiner v. Diamond Alkali Co., 288 U. S. 502, 53 S.Ct. 413, 77 L.Ed. 921.

2. Was the receipt of $46,000 in 1917 upon a contract completed in 1918 taxable income for 1917 or 1918?

In April, 1917, the petitioner entered into a contract with the Firestone Tire & Rubber Company for fabricating, delivering, and erecting complete the structural steel work for a proposed power station, pump house, and approach coal trestle at Akron, Ohio, for 7.4 cents per pound. The work was to be erected and completed by September 15, 1917. The price amounted approximately to $500,000, and the profit to $54,094. In July, 1917, the Firestone Company decided to cancel the contract. However, on the 21st of that month, the parties entered into another contract for the fabrication and grillage of certain steel at 7.15 per pound and for the cancellation of the old contract; all for the lump sum of $125,000. Of this amount, $46,000, petitioner says, was agreed upon as damages for the cancellation of the former contract. This $46,000 was included in the petitioner's income tax return for 1918 instead of for 1917, the year in which it was received, and in which petitioner now says it should have been returned.

On this point the Board said: "We are satisfied that the 'lump sum' of $125,000 should not be divided into $71,500 for 500 tons of steel at 7:15 cents per pound and $53,500 for damages for breach of the prior contract. This leaves nothing for the grillage. The record indicates that damages in some amount were paid under the contract of July 21, 1917, but we cannot say that the amount was in excess of $27,200. (2,000 tons at a profit of $13.60 per ton). It may have been less, depending upon the price of the grillage. This really disposes of the question, for, even if this amount were shifted from 1918 to 1917, the deficiencies would not be wiped out. It does not appear, however, that any amount should be shifted to income of 1917. The contract was for a lump sum. The petitioner's method of bookkeeping and of reporting income treated the contract as a whole. The profit was all accounted for and reported in 1918, when the contract was completed. At the end of 1917 the books showed a credit balance in the contract account of only $21,030.56 and the contract uncompleted. We think that the income as reported should not be disturbed in this connection."

The price of the grillage was not offered in evidence, and the petitioner says that this was through an oversight. It sought to overcome this oversight by a petition for a rehearing to which it attached exhibits showing the oversight, but the Board refused a rehearing and treated the whole transaction as one contract which was completed in 1918, and under Regulations 45, Article 36, the income of persons engaged in contracting operations "on jobs which have been finally completed, any and all monies received in payment will be returned as income for the year in which the work was completed."

As the Board says, the contract was for a lump sum, and the petitioner's method of bookkeeping and of reporting income treated the contract as a whole. Since the work was completed in 1918, and, under the above Regulations, since the money, whenever received on such a contract, is returned as income for the year in which the work is completed, we cannot say that the Board erred in so treating the contract and return under the Regulations.

3. The final question is whether or not $161,091.29 profit received by the petitioner in 1919 was taxable at 1918 rates as income from a government contract.

Section 301(c) of the Revenue Act of 1918 (40 Stat. 1089) provides that income derived in 1919 from a government contract made between April 6, 1917, and November 11, 1918, is taxable at the 1918 rates. The fact to be determined is whether or not the money here involved was derived from the contract made March 7, 1918, that is, between April 16, 1917, and November 11, 1918, or at some later date. The Board found that it was derived from the contract made on March 7, 1918, while the petitioner says it was derived from contracts made after November 11, 1918, and, in consequence, was not taxable at 1918 rates.

The government attempted to cancel the contract in question. The Commissioner says that the petitioner did not agree to the proposed cancellation; that to make the cancellation of a contract effective, it must be agreed to by both parties; that as the petitioner did not agree to it, the cancellation never took place, the contract remained in existence, and the profit in question was derived from the original contract.

There is no question about the facts. The question is one of law; the conclusion to be drawn from admitted and undisputed facts.

On November 12, 1918, the Director of Military Aeronautics sent the following telegram to the petitioner:

"Sr dash One Hundred Thirty Seven cancel entirely and stop further activity on Job One Hundred Six B. C. covering twenty one hangars one hundred ten by one sixty Bill of Material One Forty Three advise Department present status of orders and cancellation charges if any.

"Kenly Director Military Aeronautics."

Two days later, November 14, 1918, the petitioner acknowledged receipt of the above telegram in the following language: "Regarding the status of the remaining Hangars of Job 106-BC, would advise that all plain material has been rolled and considerable fabricated. We will make up a statement of cancellation charges and advise you later."

On that same day the Office of the Director of Military Aeronautics confirmed the telegram of cancellation of the contract in the following letter:

"1. Confirming telegram dated Nov. 12th requesting you to cancel all orders and further activities on the above relative to 21 hangars 110x160 in accordance with Bill of Material No. 143. It is the understanding of this office that no materials have as yet been shipped.

"2. It is requested that you advise this office the status of this order regarding its cancellation together with a full statement regarding any charges accruing through cancellation.

"3. There has been shipped out of this 21 set Buildings, one Building for the Navy at the Washington Navy Yard, one building at Dayton, Ohio, and one Building at Austin, Texas."

Two days later, however, the government changed its mind; at least did not seem to know whether or not it wanted to cancel the contract, for the Office of the Director of Aeronautics wrote the petitioner that:

"1. You are directed to cease any activity and work on any orders now in your possession for buildings of the above type issued to you by the Supply Sections, Department of Military Aeronautics in the past and prevent the accruing of any cancellation charges, if it is deemed advisable to cancel.

"2. At the present writing it is to be understood this does not cancel these orders, but precaution is being taken at this time, by general orders issued, to prevent further accruing of these charges until a careful survey can be made of the entire Military situation and decision reached as to the proper method of handling existing orders and just what materials will be needed for the demobilization, or reconstruction work.

"3. There is a great probability all orders now in your possession for materials for above buildings being necessary and needed for other purposes than Military Service.

"4. This office quite appreciates the possible disturbance caused by this action in the matter of labor and your shop arrangements, but finds it necessary, under general instructions issued, to have you observe these instructions and every effort will be made to reach a decision, which should reach you in several days.

"5. In the meanwhile it is requested that a complete schedule of materials, with full itemizations and lists be prepared, showing cancellation charges and losses as of the date of this communication."

On November 19, 1918, the petitioner advised the Director of Military Aeronautics as follows: "21–110' x 160' buildings your Job 106–BC, preliminary order dated September 24th, 1918, material all on hand or rolled and considerable fabricated. No fabricated material has been shipped and we have suspended fabrication complying with instructions in your telegram of November 13th, 1918, and letter of November 14th, 1918."

A contract may be canceled or rescinded by conduct as well as by express words.

The government told the taxpayer to stop further activity "on the job," and to "advise department of the present status of orders and cancellation charges if any." The government interpreted the above language in a letter to the petitioner written on that same day, as follows: "Confirming telegram dated November 12 requesting you to cancel all orders and further activities on the above relative to 21 hangars 110 x 160 in accordance with Bill of Material No. 143." This shows that it was the clear intention of the government to "cancel" the contract. The petitioner could have objected or consented to the cancellation. It did not object, and its consent may be inferred from its conduct. It replied, saying: "We will make up a statement of cancellation charges and advise you later." In other words, the petitioner agreed to the cancellation. It did not express any objection whatever, and went ahead to comply with the request for the "cancellation

charges." Their minds had met on the fact of cancellation, which was then complete.

When the contract had been canceled and was dead, it could not be revived and reinstated except by a new agreement and it is nowhere shown that they ever entered into a new agreement covering and reinstating this contract.

In the following month of December between the 12th and 21st, on seven separate dates, the government ordered 16 hangars, only 1 of which complied with the dimensions of the original 21. We do not think that this order was the same old, original contract for 21 hangars 110x160 as the Board seemed to think. These orders constituted new contracts. The old contract had been canceled, and all the rights under it were waived and at an end. Dreifus, Block & Co. v. Salvage Co., 194 Pa. 475, 488, 45 A. 370, 75 Am.St.Rep. 704. Consequently, the $161,091.29, not being derived in 1919 from a government contract made between April 6, 1917, and November 11, 1918, but from contracts made after the latter date, cannot be taxed at the 1918 rate.

It follows that the Board erred as a matter of law on this point.

The case is remanded to the Board, with directions to redetermine the tax in accordance with this opinion.