C. H. LEAVELL & COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5864–67.    Filed December 23, 1969.

*Tad R. Smith*, for the petitioner.
*John D. Laflin*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioner's income tax for its taxable years ending March 31, 1963 and 1965, in the amounts of $116,723.43 and $699, respectively, and found an overassessment for the year ending March 31, 1964, in the amount of $3,569.55.

Certain issues have been settled; the issues presented for decision are:

(1) Whether a joint venture, of which petitioner was a member, computed its taxable income on the basis of a calendar year or a fiscal year.

(2) Whether a contract undertaken by the joint venture was finally completed and accepted in 1960.

(3) Whether, under the completed-contract method of accounting, the time for reporting the gross income from the contract must be deferred until disputed claims arising from the contract were settled.

(4) Whether the signing of a Form 875 by the representative of the managing partner of the joint venture bound petitioner to return all of its gross income from the contract for a fiscal year ending September 30, 1961.

FINDINGS OF FACT

Petitioner C. H. Leavell & Co., a corporation, had its principal place of business in El Paso, Tex., at the time it filed its petition. Petitioner is the parent of the following corporations, whose principal offices were located at the same address as petitioner:

| *Subsidiary company* | *State of incorporation* |
| --- | --- |
| Leavell Cattle Co. | Colorado |
| Leavell Invest Co. | Delaware |
| Leabank Co. | Washington |
| New Mexico Homes, Inc. | New Mexico |
| Leavell Development Co. | Delaware |
| Leavell-Scott Corp. | Delaware |
| Lequipco, Inc. | Delaware |

Petitioner filed corporation income tax returns for the calendar year 1958, the short period ending March 31, 1959, and the fiscal year ending March 31, 1960, respectively, and consolidated income tax returns for itself and its subsidiaries for the fiscal years ending March 31, 1961, 1962, 1963, 1964, and 1965, respectively, with the district director of internal revenue, Austin, Tex.

In May 1959 petitioner, Scott & Co., S. Patti Construction Co., and MacDonald Construction Co. (hereinafter referred to as MacDonald) entered into an agreement to form a joint venture to construct launch and service buildings for an Atlas ICBM installation (to be located near Fairchild Air Force Base, Spokane, Wash.) under a contract

with the United States of America acting through the Corps of Engineers. The joint venture, known as MacDonald-Patti-Scott-Leavell (hereinafter the joint venture), was established only to carry out this contract and engaged in no other business endeavor. Each member reported its taxable income during 1960, 1961, 1962, and 1963 for taxable years ending as follows:

| Company | TYE |
|---|---|
| C. H. Leavell & Co | March 31 |
| Scott & Co | April 30 |
| S. Patti Construction Co | October 31 |
| MacDonald Construction Co | December 31 |

The pertinent provisions of the joint venture agreement are as follows:

Now, THEREFORE, the parties hereto hereby constitute themselves as Joint Venturers for the purpose of performing and completing the Construction Contract, but not for any other purposes, it being expressly understood that this agreement contemplates only the furnishing and the performance of the work, labor and materials necessary to the completion of the Construction Contract and that the parties are not making any permanent partnership agreement or permanent joint venture agreement to bid for or undertake any contract other than the Construction Contracts, * * *

To carry out the Joint Venture hereby created the parties hereto agree with each other as follows:

\*  \*  \*  \*  \*  \*  \*

2. Each party shall have an undivided interest in the Joint Venture, contribute to its working capital, participate in its net gains and profits, and share in the losses and liabilities in the proportion set opposite its name, to wit:

| | |
|---|---|
| MacDonald | 22½% |
| Patti | 22½% |
| Leavell | 25% |
| Scott Co | 30% |

\*  \*  \*  \*  \*  \*  \*

7. In order to facilitate the handling of all matters and questions in connection with the performance of the Construction Contract by the parties hereto, each of the parties appoints the person hereinafter named as its representatives with full and complete authority to act for it and in its behalf in relation to any matters or things in connection with, arising out of or relative to this agreement or said Joint Venture, and to act for and bind it in any and all matters or things involving the performance of the Construction Contract, including, but not limited to those of a contractual nature with the United States Government or third persons:

| Party | Representative |
|---|---|
| MacDonald appoints as its representative | Harold Gall |

\*  \*  \*  \*  \*  \*  \*

each party shall be bound conclusively by the acts and decisions of the representative or alternate previously appointed by it hereunder in the same manner and with the same effect as if such action had been taken or decision

made by authority of its proper officers thereunto duly authorized by its board of directors, and the term "representative" whenever used hereinafter shall be deemed to include the alternate then designated for him hereunder.

\*     \*     \*     \*     \*     \*     \*

9. The general supervision and management of the work called for by the Construction Contract and any and all matters relating thereto shall be under the general charge and control of a Project Manager who shall be subject only to the control of the parties hereto through their respective representatives, and said Project Manager shall be given such specific powers in addition to the foregoing as said representatives from time to time may delegate. \* \* \* The Project Manager shall be selected and designated by MacDonald and any person so designated shall serve in said capacity until MacDonald selects and designates a substitute or successor to act in his place and stead.

\*     \*     \*     \*     \*     \*     \*

12. \* \* \* A periodic audit of said books shall be made by such accountant or independent firm of accountants as the parties through said representatives may designate, and such periodic audits upon the request of any of the parties hereto shall include a comparison between the items of cost and the items set up in the estimate of cost. Upon completion of the Construction Contract a complete and final audit and true and correct accounting shall be had of all expenses and all accounts, vouchers, records and data relating to the Construction Contract and Joint Venture \* \* \*

\*     \*     \*     \*     \*     \*     \*

17. The relationship between the parties shall be limited to the performance of the Construction Contract in accordance with the terms of this agreement. This agreement shall be construed and deemed to be a Joint Venture for the carrying out of the Construction Contract and the rights and relations hereunder of the parties hereto concerning the subject matter hereof shall be determined by the ordinary rules of partnership. Nothing herein contained shall be considered to constitute the parties partners nor constitute any party hereto the general agent of any other party.

Work under the contract was begun in May 1959. One of Mac-Donald's vice presidents was designated as the project manager and, together with the representative from the Corps of Engineers, he conducted monthly examinations of the project. Following each such examination they agreed upon the percentage of completion of the various components of the project and then applied these percentages to the respective contract price for each component to determine the amount of the progress payment. The project manager then prepared payment estimates and submitted them to the Corps of Engineers to request compensation for the work performed to that date.

These payment estimates disclose that as of October 25, 1960, all items of work were 100-percent complete except the physical construction of the launch facility, which was 99.95-percent complete. The last on-site mechanical work by the joint venture was performed during the week ending November 16, 1960. By November 30, 1960, the contract was completed except for punch-list items—replacing and tightening screws, patching, and the like. By this date the final cleanup

work, which basically consisted of janitorial service, was also completed. No further work was performed by the manual workers after December 11, 1960. Nor did any of the subcontractors perform any services after this date. By December 12, 1960, the launch facility was 99.99-percent complete, and by December 19 the entire project was 100-percent complete.

In a letter dated December 19, 1960, the Spokane Area Engineer for the Corps of Engineers advised the commander of Fairchild Air Force Base of the "final transfer" of the launch and service buildings for the Atlas ICBM. The letter listed six items as "deficiencies," but the joint venture did no further work to remedy such deficiencies. Later, under letter dated November 24, 1961, the Corps of Engineers informed the joint venture that the last of the work performed under the contract was accepted as of December 19, 1960.

In early November 1960, when the contract was nearing completion, petitioner had been requested by other members of the joint venture to select an accounting firm to prepare the financial statement contemplated by paragraph 12 of the joint venture agreement, quoted in pertinent part above. The firm of Randall, Emery, Campbell & Parker, Certified Public Accountants, was selected.

The joint venture elected to compute its taxable income under the completed-contract method of accounting. It considered filing its partnership returns of income, Form 1065, for a fiscal year ending April 30, but ultimately filed them on the basis of a calendar year. The customary way to inform the Internal Revnue Service of the adoption of a particular accounting period is to use the blanks provided for this purpose on the face of the tax return. The heading of the Form 1065 filed by the joint venture on or about March 31, 1961, was as follows:

U.S. PARTNERSHIP RETURN OF INCOME

(To be filed also by syndicates, pools, joint ventures, etc.)

FOR CALENDAR YEAR 1960

or other taxable
year beginning _____ 1960, and ending _____, 19____

The blanks were not filled in. In this return the joint venture reported "Gross Estimates, Received and Accrued" and "Other Income" in the respective amounts of $9,002,985.90 and $180,101.98, expenses in the amount of $8,330,232.16, and net income in the amount of $852,855.72. The return reflected that petitioner's share of the net income was $213,213.92.

Attached to the Form 1065 for 1960 was a schedule headed as follows:

MacDonald-Patti-Scott-Leavell

(Joint Venture)

Project: SM–65 Missile Launch Complexes, Fairchild A.F.B. Washington
For the Period From May 17, 1959 to November 30, 1960

The dates, May 17, 1959, and November 30, 1960, were taken from a financial statement prepared by Randall, Emery, Campbell & Parker; they were intended to designate the dates on which the construction contract was begun and substantially completed, respectively, and not the election of a fiscal year. The amount shown on the statement as gross earnings from the contract reflected all income received during the calendar year 1960, including $338,343.46 received between November 30 and December 31, 1960. Such amount did not include claims against the Corps of Engineers for additional compensation or claims by subcontractors against the joint venture attributable to acceleration demands and delays for which the Government was responsible. The amount that would ultimately be allowed on these claims was contingent and uncertain in 1960.

By February 1961 the joint venture had determined the amount of its claims, and those of its subcontractors, for additional compensation. The claims, totaling $1,035,461.11, were submitted to the Corps of Engineers in 1961, and were allowed and paid in the amount of $738,037.10 in September of that year. Randall, Emery, Campbell & Parker thereupon prepared a second financial statement, for the period May 17, 1959, to September 30, 1961. This financial statement, similar to the one affixed to the joint venture's 1960 return, formed the basis of, and was attached to, a Form 1065 filed by the joint venture on November 13, 1961. The blanks on the face of the return were not filled in. This return reflected net income of $197,470.22 over and above the sum reported in the return filed for 1960, and petitioner's share of this income was shown to be $49,367.56.

On July 18, 1962, MacDonald's representative sent to petitioner a check for $3,147.46, representing the final disbursement of funds to petitioner from the joint venture.

A third financial statement was prepared by the accounting firm, covering the period May 19, 1959, through September 30, 1962, for the purpose of presenting a complete picture of the contract for the period from its inception until all funds were distributed. The statement shows that the last check drawn on the joint venture's bank account was paid on September 3, 1962, leaving a zero balance, and that as of September 30, 1962, the joint venture had no assets and no liabilities.

A partnership return was filed by the joint venture on or about February 23, 1963, reporting income from the sale of certain items

of tools and equipment between September 11, 1961, and September 30, 1962. Again, the appropriate blanks for a fiscal year return were not filled in. Petitioner's share of the reported income was shown to be $1,555.98.

On March 25, 1963, Harold Gall, the representative and vice president of MacDonald, wrote S. Patti Construction Co. that MacDonald had been informed by the Internal Revenue Service that an audit would be made of the joint venture's books and records. However, no copy of this letter or any similar communication was sent to petitioner. On March 27, 1963, a revenue agent commenced his audit of the joint venture's records, which were located at MacDonald's office in Seattle.

On April 26, 1963, the revenue agent wrote MacDonald explaining that execution of a Form 875 by one of the joint venturers would constitute acceptance of his findings that the total income from the joint venture should be reported for a fiscal year ending September 30, 1961. The agent chose this date "because the amount received or to be received after 11/30/1960 was not settled until 9/30/1961 and is relatively material to the amounts involved and adheres to the completed contract method of reporting." No copy of this letter was sent to petitioner. On May 2, 1963, Gall executed a Form 875, "Acceptance of Examining Officer's Findings by a Partnership * * *"; the form was signed "H. E. Gall, Vice President" and identified the "partnership" as "Mac-Donald-Patti-Scott-Leavell. Copies of this correspondence were sent to MacDonald's comptroller and accountant, but not to petitioner. On May 6, 1963, the revenue agent prepared a preliminary statement reflecting the conclusions of his April 26, 1963, letter. Petitioner was not informed of these developments by MacDonald, because the joint venture had been dissolved by mutual agreement approximately a year earlier.

At the time the revenue agent conducted the audit, he examined the joint venture agreement and records and was aware (1) that there were no assets or liabilities on the books of the joint venture, and (2) that the joint venture was no longer in business, having completed the construction project for which it was formed. The agent, therefore, asked Gall to contact all the partners, which the latter failed to do. Instead Gall wrote MacDonald's comptroller advising him that a preliminary statement had been received from the Internal Revenue Service and suggesting that "if necessary, you notify the joint venture participants." Petitioner was not so notified; in fact, petitioner first learned that respondent had concluded that all the income of the joint venture should be reported in a fiscal year ending September 30, 1961, upon an audit by respondent in 1965.

In its income tax returns for its fiscal years ending March 31, 1961, March 31, 1962, and March 31, 1963, petitioner reported amounts of $213,213.92, $49,367.56, and $1,555.98, respectively, as its 25-percent share of income from the joint venture. Respondent determined that all of petitioner's income from the joint venture should have been reported in petitioner's fiscal year ending March 31, 1962. This resulted in the disallowance of a claimed net operating loss carryover from the fiscal year ending March 31, 1961, to the fiscal year ending March 31, 1963, in the amount of $175,661.16.

### ULTIMATE FINDINGS OF FACT

The joint venture elected the completed-contract method of accounting. Its contract with the Corps of Engineers was finally completed and accepted not later than December 19, 1960.

The joint venture adopted the calendar year as its taxable year. In its 1960 return it reported all income received and accrued in that year under its contract. In its succeeding return it reported income derived from claims which were contingent and uncertain at the end of 1960.

The execution of the Form 875 by the representative of MacDonald was not authorized by petitioner and does not affect petitioner's right to have the issues here presented decided on their merits.

### OPINION

The principal issue is whether, under the completed-contract method of accounting, the joint venture's contingent claims for additional compensation caused the time for reporting the gross income from its contract to be deferred until the claims were settled. To narrow this issue to the controlling facts of the present case, two subsidiary issues must first be resolved: (1) Whether the joint venture reported its income on the basis of a calendar year, as contended by petitioner, or a fiscal year ending November 30 or September 30, as contended by respondent; and (2) in what taxable period was the joint venture's contract "finally completed and accepted" within the meaning of section 1.451–3(b)(2) of the Income Tax Regulations.

Section 706(b)[1] provides that the taxable year of a partnership, defined by section 761(a) to include a joint venture, "shall be determined as though the partnership were a taxpayer" and that a partnership may not adopt a taxable year other than that of all of its "principal partners,"[2] unless it establishes "a business purpose therefor."

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

[2] A principal partner is one having at least a 5-percent interest in the partnership profits or capital. Sec. 706(b)(3). All four joint venturers meet this test.

The regulations [3] further provide that a "newly formed partnership" must secure prior approval from the Commissioner for the adoption of a taxable year, except that it may adopt a calendar year without securing such approval if all of its principal partners are not on the same taxable year. In any other case, the regulations provide, a newly formed partnership must secure prior approval of the Commissioner for the adoption of a taxable year. Cf. *Austin Clapp*, 36 T.C. 905 (1961), affirmed on another issue 321 F. 2d 12 (C.A. 9, 1963).

Under these general principles the joint venture's taxable year quite clearly was the calendar year. The joint venture filed a 1960 partnership return which reflected on its face that it was a calendar year return and which was timely only if so regarded. Each member of the joint venture had a different taxable year, and the joint venture, guided by highly competent accountants, did not seek respondent's approval for the adoption of a fiscal year. While the joint venture's failure to seek such approval before filing a return is not conclusive, see *Jonas Cadillac Co.*, 16 B.T.A. 932 (1929), affd. 41 F. 2d 141 (C.A. 7, 1930) ; *Bass* v. *Stimson*, 20 T.C. 428 (1953), it corroborates the testimony of Joseph W. Bettger, a certified public accountant employed by MacDonald to prepare the joint venture's partnership returns, and M. V. Beckstrand, petitioner's accounting officer, that the joint venture intended to, and did, file its returns on the basis of a calendar year. Petitioner had previously participated in several other joint ventures, and none of them had filed its partnership returns on a fiscal year basis. No reason has been suggested for the alleged deviation from this practice in the present case.

Still another statutory provision supports petitioner's contention. Section 441(g)(2) [4] provides that a taxpayer's taxable year shall be the calendar year if it does not have an "annual accounting period"— defined by section 441(c) [5] as the annual period on the basis of which

---

[3] Sec. 1.706–1(b)(ii), Income Tax Regs., provides in pertinent part as follows :

Sec. 1.706–1 *Taxable years of partner and partnership.*

(b) *Adoption or change in taxable year—* * * *

(ii) A newly formed partnership may adopt a taxable year which is the same as the taxable year of all its principal partners * * * without securing prior approval from the Commissioner, or it may adopt a calendar year without securing prior approval from the Commissioner if all its principal partners are not on the same taxable year. In any other case, a newly formed partnership must secure prior approval from the Commissioner for the adoption of a taxable year.

[4] SEC. 441. PERIOD FOR COMPUTATION OF TAXABLE INCOME.

(g) NO BOOKS KEPT; NO ACCOUNTING PERIOD.—Except as provided in section 443 (relating to returns for periods of less than 12 months), the taxpayer's taxable year shall be the calendar year if—

*   *   *   *   *   *   *

(2) the taxpayer does not have an annual accounting period ; or

[5] SEC. 441. PERIOD FOR COMPUTATION OF TAXABLE INCOME.

(c) ANNUAL ACCOUNTING PERIOD.—For purposes of this subtitle, the term "annual accounting period" means the annual period on the basis of which the taxpayer regularly computes his income in keeping his books.

the taxpayer regularly computes his income in keeping his books. The joint venture had elected the completed-contract method of accounting. Under this method, as discussed more fully below, the gross income derived from each contract is not computed periodically, but is reported for the taxable year in which the contract is finally completed and accepted. Sec. 1.451–3(b)(2), Income Tax Regs., quoted in footnote 8, *infra*. Therefore, since the joint venture had no income or expenses unrelated to that contract, it had no annual accounting period. In these circumstances, under section 441(g)(2), the joint venture's taxable year was the calendar year.

Respondent's contention that the joint venture reported on a fiscal year is based primarily on the attachment to the 1960 return headed "For the Period From May 17, 1959 to November 30, 1960," and the attachment to the 1961 return headed "For the Period From May 17, 1959 to September 30, 1961." But these attached statements were adequately explained. The joint venture's management concluded that the contract was, for all practical purposes, completed on November 30, 1960, and retained an accounting firm to prepare a statement which would be the basis for the settlement of accounts among the members of the joint venture. This statement was used in preparing the 1960 return and reflected all income received as of November 30, 1960, plus $338,343.46 claimed as compensation for work done on approved changed orders and received between that date and the end of the calendar year. The return excluded only amounts which had not accrued because they were then in dispute. Such amounts were settled and collected prior to September 30, 1961, and were reflected as income in the statement attached to the 1961 return.

Adopting respondent's reasoning would require us to conclude that the joint venture's 1960 return was filed for a fiscal year ending November 30 and its 1961 return for a fiscal year ending September 30. This we cannot do. No sound reason is suggested by respondent to support such a vacillation in accounting periods. Moreover, such a conclusion would violate the general principles of section 706(b), discussed above, and would be inconsistent with the rule that after a taxpayer adopts a calendar or fiscal year he must use it in making returns for subsequent years. Sec. 1.441–1(b)(4), Income Tax Regs. It would subvert the principle of *Jonas Cadillac Co.*, *supra*, that the Commissioner's approval of a change of accounting period may be evidenced by acceptance of a return as filed. Implicit in that principle, we believe, is a requirement of clear evidence that the taxpayer changed its accounting period. Such evidence is lacking here.

Our conclusion that the joint venture adopted a calendar year basis for reporting its income narrows the second subsidiary issue to a question whether the joint venture's contract was finally completed and

accepted in 1960. The record is unmistakably clear, and respondent has conceded,[6] that the contract work was finally completed and accepted not later than December 19, 1960.[7]

Respondent argues, however, that even though the contract was finally completed and accepted on December 19, 1960, it must be kept open for tax-accounting purposes until sometime in 1961 when all the disputed claims for additional compensation were resolved. Prior to 1961, respondent contends, the net result of the project could not be ascertained because the income and expenses generated by the contract could not be matched in a single return. Relying upon *Thompson-King-Tate, Inc.* v. *United States*, 296 F.2d 290 (C.A. 6, 1961), respondent emphasizes that the basic objective of the completed-contract method is to tax the income and allow deductions for the expenses of the contract in the same year. This argument poses the principal issue—the effect of the joint venture's contingent claims for additional compensation.

The short answer to respondent's argument is that the regulation authorizing the completed-contract method, sec. 1.451–3(b)(2), Income Tax Regs.,[8] requires the gross income to be reported in "the taxable year in which the contract is finally completed and accepted," and respondent has conceded that the contract was completed and accepted not later than December 19, 1960. In this regard, respondent's heavy reliance on *Thompson-King-Tate, Inc.* v. *United States, supra,* is misplaced. There the contract of the taxpayer, a subcontractor, specifically provided that the prime contractor would not be required to accept and pay for the taxpayer's work until the entire prime contract was finally and fully accepted by the customer. Although the taxpayer completed its work in 1953, the prime contract was not accepted until 1955, and hence the gain was held to be taxable in the latter year. Here,

---

[6] Respondent filed a memorandum with the Court on Nov. 6, 1969, stating the following:

"Respondent wishes to make clear that his argument concerning the existence of outstanding claims on and after December 19, 1960, is not intended to imply that the contract was not finally completed and accepted on December 19, 1960, within the meaning of the existing Regulations."

[7] Since the joint venture reported on a calendar year basis, and the contract was not only substantially completed, but was fully completed, before the end of 1960, we need not enter the quagmire of conflicting decisions involving the question whether substantial completion of a contract meets the requirement of the regulations. Compare, e.g., *Ehret-Day Co.*, 2 T.C. 25 (1943), and *Standard Paving Co.*, 13 T.C. 425, 438 (1949), affd. 190 F. 2d 330 (C.A. 10, 1951), certiorari denied 342 U.S. 860 (1951), with *E. E. Black, Limited* v. *Alsup*, 211 F. 2d 879 (C.A. 9, 1954), and *Thompson-King-Tate, Inc.* v. *United States*, 296 F. 2d 290 (C.A. 6, 1961).

[8] Sec. 1.451–3 *Long-term contracts.*

(b) *Methods.* * * *

(2) *Completed contract method.* Gross income derived from long-term contracts may be reported for the taxable year in which the contract is finally completed and accepted. Under this method, there shall be deducted from gross income for such year all expenses which are properly allocable to the contract, taking into account any material and supplies charged to the contract but remaining on hand at the time of completion.

respondent's concession that the contract was completed and accepted not later than December 19, 1960, renders that case inapposite.

There are other fundamental reasons why the joint venture correctly reported the gross income from the contract in 1960. The completed-contract method is a modification of the accrual method of accounting. It differs from the accrual method in that items of accrued income and accrued expense, though recorded in primary accounts, are carried into profit and loss not at the end of an annual accounting period but only when the contract is completed and accepted. See sec. 1.451–3(b)(2), Income Tax Regs., fn. 8, *supra; Fort Pitt Bridge Works*, 24 B.T.A. 626, 641 (1931), affirmed on this issue 92 F. 2d 825 (C.A. 3, 1937), certiorari denied 303 U.S. 659 (1938). Applying the method in this manner will usually achieve the desired result of matching income and related expenses in the same taxable period.

However, notwithstanding the completion and acceptance of the contract, if the right to receive an outstanding item of income or the obligation to pay an anticipated expense is "contingent and uncertain," that income or expense is not reported until the dispute is resolved. This is so even though the result may be a failure to achieve perfect correlation of the reporting of the income and expenses of the contract. The rule was stated in *National Contracting Co.*, 37 B.T.A. 689, 701–702 (1938), affd. 105 F. 2d 488 (C.A. 8, 1939), as follows:

Under the completed contracts method of accounting the ordinary rule in the case of items outstanding when a contract is "completed" is that "it is the right to receive and not the actual receipt that determines the inclusion * * *." [8] Unless this accrual of outstanding items is made in the year of completion, the purpose of the completed contracts method, namely, to account for the entire results of a contract at one time,[9] is defeated. However, as a general principle, when outstanding items are "contingent and uncertain," such as disputed claims in litigation, accrual is not proper. *Commissioner* v. *John Thatcher & Son*, 76 Fed. (2d) 900; *North American Oil Consolidated* v. *Burnet*, 286 U.S. 417. While no case has apparently purported to determine this question under the long term contracts method, no reason appears why the rule should be less applicable to that type of accrual. And that this procedure may leave the exact profit or loss open for future adjustment is not fatal . *W. J. Scholl Co.*, 30 B.T.A. 993, 997. [Footnotes omitted.]

Accord, *Edward J. Hudson*, 11 T.C. 1042, 1050 (1948), affd. 183 F. 2d 180 (C.A. 5, 1950), 184 F. 2d 518 (C.A. 5, 1950); *A. D. Irwin*, 24 T.C. 722, 727–728 (1955), affd. 233 F. 2d 874 (C.A. 3, 1956); [9] cf. *Mesta Machine Co.*, 12 B.T.A. 523 (1928).

---

[9] The rule is summarized in 2 Mertens, Law of Federal Income Taxation, sec. 12.134, as follows:

"Where income is reported on the completed contract method of accounting items that are contingent and uncertain, such as disputed claims and litigation, should not be reported in the year of completion of the contract but should be left for adjustment in the year in which they are finally settled. * * *"

The joint venture followed these principles in filing its returns. The $9,002,985.90 reported on its 1960 return reflected all payments received under the contract, as well as claims not in dispute. The additional claims, covering excessive costs attributable to both delays beyond the joint venture's control and acceleration of the project at the Government's demand, totaling $1,035,461.11, were concededly in dispute at the end of the year.[10] The joint venture's recovery of $738,037.10 (7.6 percent of the total contract receipts) on these claims in 1961 was reported in its return for that year. We recognize that the outcome of a pending dispute may involve such a substantial amount as to make ascertainment of the contract results in terms of gain or loss impossible, and thereby justify a delay in reporting any of the contract income. Cf. *Carolina Contracting Co.*, 32 B.T.A. 1171 (1935). However, 7.6 percent of the total contract receipts is not, in our view, sufficient to render inapplicable the provision of the regulation that the gross income is to be reported for the taxable year in which the contract is finally completed and accepted.

Respondent argues, but not strenuously, that petitioner is "bound by" the Form 875, which was signed by Harold Gall, the representative of MacDonald, long after the joint venture was terminated and purported to agree that it should report the profit from the contract for a fiscal year ending September 30, 1961.[11] This argument is without merit.

Although the partnership named on the Form 875 was the joint venture, it was signed "H. E. Gall, Vice President," and Gall was only the vice president of MacDonald, not of the joint venture.[12] The joint venture agreement explicitly denied Gall the authority to act as petitioner's partner or agent;[13] the Form 875 was signed without consulting petitioner, and petitioner did not learn that it had been signed until several months later. Finally, respondent did not plead estoppel, *John B. Hollister*, 44 B.T.A. 851 (1941); and, unlike a closing agree-

---

[10] Since the 1960 return was the first return filed by the joint venture, it was entitled to employ any permissible method of accounting. Sec. 1.446–1(e)(1), Income Tax Regs. Therefore, we are not confronted with the question presented in *H. F. Campbell Co.*, 53 T.C. 439 (1969), decided this day, where the taxpayer, after consistently reporting its income for a period of 8 years under a type of completed-contract method which kept contracts open until disputed claims were settled, began reporting its income for the year in which its contracts were finally completed and accepted. Cf. *National Contracting Co.*, 37 B.T.A. 689, 701 (1938), affd. 105 F. 2d 488 (C.A. 8, 1939).

[11] Form 875 (Sept. 1950 rev.), "Acceptance of Examining Officer's Findings by a Partnership, Fiduciary, or Small Business Corporation," provides that "The person named below has reviewed the recommendation covering an investigation of its return(s) of income, which discloses a change in income and the distribution of the total income as corrected. The findings of the examining officer are hereby accepted."

[12] MacDonald's comptroller testified that the amount of MacDonald's ultimate tax liability would not be affected one way or the other by signing the form.

[13] The agreement provided that "Nothing herein contained shall be considered to constitute the parties partners nor constitute any party hereto the general agent of any other party."

ment, sec. 7121, or a compromise, sec. 7122, the Form 875, like a Form 870 or 870AD, does not preclude petitioner from litigating the merits of the issues here presented. Cf. *Botany Mills* v. *United States*, 278 U.S. 282 (1929); *Uinta Livestock Corporation* v. *United States*, 335 F. 2d 761 (C.A. 10, 1966); *Arthur V. Davis*, 29 T.C. 878 (1958).

Petitioner correctly reported as its share of the joint venture income the respective amounts of $213,213.92, $49,367.56, and $1,555.98 for its fiscal year years ending March 31, 1961, March 31, 1962, and March 31, 1963. To reflect petitioner's concessions on other issues,

*Decision will be entered under Rule 50.*