POINT COMFORT VENTURE, F & E ERECTION COMPANY, INC., TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Point Comfort Venture v. Commissioner
Docket No. 2099-89
United States Tax Court
T.C. Memo 1990-574; 1990 Tax Ct. Memo LEXIS 645; 60 T.C.M. (CCH) 1193; T.C.M. (RIA) 90574; October 31, 1990, Filed *645 Decision will be entered for the respondent. W. Thomas Weir and Edward S. Koppman, for the petitioner. Phillip A. Pillar, for the respondent. WRIGHT Judge. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION By notice of Final Partnership Administrative Adjustment (FPAA), respondent made the following adjustments in petitioner's Federal income tax: Year
Adjustment
1983
$ 4,277,477.38
1984
2,807,344.46
1985
1,535,624.62
The sole issue for decision is whether Point Comfort Venture is entitled to report income from the sale of goods under the completed contract method of accounting where the purchasers are not parties to a long-term contract. FINDINGS OF FACT Some of the *646 facts have been stipulated and are found accordingly. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. F & E Erection Company, Inc. (hereinafter referred to as petitioner), had its principal place of business in San Antonio, Texas, when it filed its petition in this case. Petitioner is the tax matters partner of Point Comfort Venture. Point Comfort Venture is a Texas general partnership created by a joint venture agreement dated November 19, 1982, between petitioner and ProlerInternational Corp., a Texas corporation. Petitioner, the general partner of Point Comfort Venture, owns 50 percent of the partnership. Proler owns the remaining 50 percent. Petitioner is a recognized expert in aluminum refinery and smelter construction, while Proler is a buyer, seller, and processor of metals. On October 20, 1982, the Aluminum Company of America (Alcoa) invited petitioner to bid on a project which involved the dismantling of a smelting plant and other buildings at Alcoa's Point Comfort, Texas Operations, and the sale to petitioner of the property which it dismantled. The project was a very significant one which would require several years *647 to complete. On December 22, 1982, petitioner entered into a contract (hereinafter referred to as the contract) with Alcoa. Petitioner then assigned its interest in the contract to Point Comfort Venture. Article I of the contract provides in part that: This is an agreement whereby the Contractor will perform certain work for the Owner in connection with the demolition and dismantling of the smelting plant and other buildings at the Owner's Point Comfort, Texas Operations and for the sale by Owner to the Contractor of certain property which the Contractor dismantles. The Owner agrees to sell to the Contractor and the Contractor agrees to buy from the Owner the scrap property ("property") described on Exhibit A in accordance with the "Terms and Conditions of Sale of Property" set forth on Exhibit B.
Upon receipt of payment and an executed copy of the contract, Alcoa delivered to petitioner, on behalf of Point Comfort Venture, a bill of sale. The bill of sale provides, in relevant part, that "title to and risk of loss with respect to the property, as personalty and not as realty, shall pass to F & E on the date hereof." The bill of sale required that petitioner *648 "shall dismantle the property in accordance with the provisions of the contract." The purchase price payable to Alcoa for the property totalled $ 7,026,024.77. Under the contract Point Comfort Venture was to perform dismantling work for Alcoa for which it would receive a credit of $ 661,722 against the purchase price. After application of this credit to the purchase price, the reduced cash purchase price was $ 6,364,302.77. Other than the credits provided for work performed for Alcoa and certain materials sold back to Alcoa, Point Comfort Venture received no income from Alcoa pursuant to the contract. Point Comfort Venture looked to the sale of the scrap from the plant in order to realize a profit on the contract. The first sale of salvage occurred pursuant to a contract dated December 10, 1982, between Point Comfort Venture and Becker Metals of St. Louis, Missouri. Approximately $ 10,000,000 of the $ 15,000,000 of aluminum marketed by Point Comfort Venture had been sold by December 1983. Point Comfort Venture completed a total of 135 contracts for the sale of scrap metal, the last of which was entered into on December 4, 1986. Point Comfort Venture reported the income from *649 the sale of scrap metal under the completed contract method of accounting. The adjustments at issue were based on respondent's determination that the purchase of the property for the purpose of dismantling and selling it to third parties did not qualify as a long-term contract within the meaning of section 1.451-3(b)(1), Income Tax Regs., and therefore, all income and expenses generated as a result of that contract should be classified as current year income and expenses. OPINION Section 451(a) provides that generally income must be included in gross income upon receipt unless the taxpayer's method of accounting dictates inclusion in a different period. The regulations provide that income from a "long-term contract" may be included in gross income in accordance with one of the two long-term contract methods: (1) the percentage of completion method, or (2) the completed contract method. Whichever method is chosen must clearly reflect income. Sec. 1.451-3(a)(1), Income Tax Regs. Under the completed contract method gross income derived from long-term contracts must be reported by including the gross contract price of each contract in gross income for the taxable year in which *650 such contract is completed. Sec. 1.451-3(d)(1), Income Tax Regs.
The term "long-term contract" means a building, installation, construction, or manufacturing contract which is not completed within the taxable year in which it is entered into. Sec. 1.451-3(b)(1)(i), Income Tax Regs. A manufacturing contract is a long-term contract only if such contract involves the manufacture of (1) unique items of a type not normally carried in the finished goods inventory of the taxpayer, or (2) items which normally require more than 12 calendar months to complete. Sec. 1.451-3(b)(1)(ii), Income Tax Regs.
The completed contract method of accounting has been recognized as being peculiarly adapted to a business fulfilling contracts which are not completed during one accounting period, and where the ultimate gain or loss cannot be accurately determined until the contract is completed. Fort Pitt Bridge Works v. Commissioner, 24 B.T.A. 626, 641 (1931), affd. on this issue 92 F.2d 825 (3d Cir. 1937).Petitioner bears the burden of proving that Point Comfort Venture is entitled to use the completed contract method of accounting. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). *651 Issue Presented
As a preliminary matter, we must decide what is at issue in the instant case. In the stipulation of facts the parties agreed that "the legal question presented in this case is whether respondent erred in determining that the Contract is not a long-term contract within the meaning of Treas. Reg. section 1.451-3(b) and that, therefore, Point Comfort Venture was not entitled to use the completed contract method of accounting in reporting its income from the Contract." Petitioner contends that because of this stipulation respondent is forestalled from arguing that the sales of materials to third parties do not qualify for the completed contract method of accounting. That is, petitioner argues that if we find that the contract between ALCOA and petitioner, wherein petitioner assigned its interest to Point Comfort Venture, is a long-term contract, we must find that the sales to third parties qualify for the completed contract method. However, respondent does not contend that petitioner has unreported income from the Alcoa contract itself. Respondent based his FPAA on his determination that the sales to third parties did not qualify for the completed contract *652 method. In addition, respondent's conduct at trial was consistent with such determination. Finally, respondent's post-trial briefs make it clear that what is really at issue is whether Point Comfort Venture is entitled to report income from the sale of goods to third parties under the completed contract method of accounting. Based on the FPAA, respondent's conduct at trial, and his briefs, we reject petitioner's argument with respect to the issue which we must determine. Integrated Transaction
Petitioner argues that the purchase of the Point Comfort plant, its demolition, and the sales of scrap metal should be considered a single, integrated contract in determining whether the transactions qualify for the completed contract method of accounting. Petitioner contends that "Alcoa itself did not pay PCV for its services in dismantling and demolishing the Point Comfort smelter." However, the record makes clear that Point Comfort Venture received a credit against the purchase price of $ 661,722 from Alcoa for the dismantling of the plant. The regulations provide that for the purpose of clearly reflecting income, it may be necessary in some instances either to treat one agreement *653 as several contracts or to treat several agreements as one contract. Sec. 1.451-3(e)(1), Income Tax Regs. Whether an agreement should be so severed or several agreements so aggregated will depend on all the facts and circumstances. Several agreements will not generally be aggregated unless the several agreements would be treated as one contract under customary commercial practice in a taxpayer's trade or business or unless there is no business purpose for entering into several agreements rather than one agreement. An example of a factor which is evidence that two contracts entered into between the same parties should be aggregated is that one of the contracts would not have been entered into containing the terms agreed upon but for the entering into of the other contract. Sec. 1.451-3(e)(1)(vii), Income Tax Regs. Petitioner has failed to introduce any evidence showing that it was customary commercial practice in its trade or business to aggregate the demolition contract with the 135 sales contracts or that there was a business purpose for entering into several agreements rather than one agreement. The regulations provide the following example of a case where contracts may be *654 aggregated: Y, a calendar year shipbuilder using a long-term contract method, enters into two contracts at about the same time during 1972 with M. These contracts are the product of a single negotiation. Under each contract, the taxpayer is to construct for M a submarine of the same class. Although the specifications for each submarine are similar, it is anticipated that, since the taxpayer has never constructed this class of submarine before, the costs incurred in constructing the first submarine (to be delivered in 1973) will be substantially greater than the costs incurred in constructing the second submarine (to be delivered in 1974). If the contracts are treated as separate contracts, it is estimated that the first contract would result in little or no gain, while the second contract would result in substantial profits. It is unlikely that Y would have entered into the contract to construct the first submarine for the price specified without entering into the contract to construct the second submarine. In these circumstances, the two contracts must be treated as one contract for purposes of applying Y's long-term contract method. [Sec. 1.451-3(e)(2), Example (2), Income *655 Tax Regs.]
The example is distinguishable from the instant case in several respects. First, in the example the two contracts were entered into at about the same time, while in the instant case the 135 contracts at issue were entered into over a period of several years. Second, the contracts in the example are the product of a single negotiation, while in the instant case they are not. Third, the contracting parties in the example are identical in both contracts, while in the instant case they are not. In conclusion, we find that in the instant case the contract to demolish may not be aggregated with the contracts to sell scrap metal. Accounting for Sales to Third Parties
Respondent relies on C. H. Swift & Sons, Inc. v. Commissioner, 13 B.T.A. 138 (1928), and Deer Island Logging Co. v. Commissioner, 14 B.T.A. 1027 (1929), in arguing that the sales by Point Comfort Venture to third parties may not be reported under the completed contract method. These cases establish, respondent argues, that section 1.451-3(a), Income Tax Regs., applies only to sales or executory contracts which are directly productive of gross income. *656 In C. H. Swift & Sons, Inc. v. Commissioner, supra, the taxpayer purchased lots of lumber which it then resold. This Court held that: Having acquired a quantity of lumber by purchase, contracted for more, and sold a part of that acquired, petitioner contends it should at present report no income since the ultimate outcome is doubtful of the venture in purchasing the lumber. There were no unfilled sales orders at the end of the year so far as we know. The situation was simply that a quantity of the lumber remained on hand unsold. By no stretch of the imagination can such a situation be included in the provisions of article 36 [the regulatory precursor of section 1.451-3(a), Income Tax Regs.], which obviously refers to sales or executory contracts which are directly productive of gross income. [13 B.T.A. at 142.]
In Deer Island Logging Co. v. Commissioner, supra, the taxpayer was denied the long-term method of accounting for income from the resale of timber which petitioner had purchased, cut, and processed. The Court commented that: Here the petitioner was not holding itself out as offering its *657 services or binding itself to perform services for which it was to be paid by the contracting parties, but, to the contrary, it obligated itself to pay to the contracting parties certain amounts for the timber as removed. The profitableness of the contract, insofar as petitioner was concerned, inured in the profit it was to derive from the resale of the timber to others and its success in selling such timber at a profit was and did gauge the extent of the income it earned. [14 B.T.A. at 1037.]
We find the instant case indistinguishable from Deer Island Logging Co. As in that case, petitioner acquired a quantity of a raw material which was processed and then sold to third parties. As in that case, the contract between petitioner and the supplier of the raw material was a purchase and sale which did not directly produce gross income. In the instant case petitioner was obligated to demolish the Point Comfort plant prior to selling the scrap metal, for which it received a credit against the purchase price. Likewise, the taxpayer in Deer Island Logging Co. was obligated to cut the trees which it later processed and sold. Based on our decision *658 in Deer Island Logging Co., we sustain respondent's determination. In light of the foregoing, Decision will be entered for the respondent.