EHRET-DAY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 109528. Promulgated June 8, 1943.

*Fred L. Rosenbloom, Esq.*, for the petitioner.
*Harry L. Brown, Esq.*, for the respondent.

OPINION.

Tyson, *Judge:* The first question presented is whether the income from the two construction contracts described in the findings of fact should be taxed as part of the petitioner's income for the year 1938. Article 42–4 of Regulations 101, promulgated under the Revenue Act of 1938, permits the reporting of income from long term contracts "for the taxable year in which the contract is finally completed and accepted if the taxpayer elects as a consistent practice so to treat such

income, provided such method clearly reflects the net income." The provisions of that article, which have been in force without change since the enactment of the Revenue Act of 1921, are set forth in the margin.[1] The respondent determined that the contracts were "completed and accepted" in 1938, and he included the profit in the petitioner's income for that year. The amount of the profit realized from each contract has been stipulated; and, although the North End Hotel contract covered a period of about three months, the respondent does not question the petitioner's right to report the income from that contract under the provisions of the regulations. See *L. A. Wells Construction Co.*, 46 B. T. A. 302.

The petitioner opposes the inclusion of the income from the contracts in its income for 1938 on the grounds that the contract for the store and office building (hereinafter referred to as the Fredericks contract) was neither completed nor accepted until 1939, and that the North End Hotel contract was not accepted until 1939, its theory being that, under the cited regulations, the inclusion of the profit in income is conditioned upon both completion and acceptance and that where completion occurs in one year and acceptance occurs in a later year, the reporting of the income must be deferred to the year of acceptance.

On the question of the time of the completion of the Fredericks contract there is dispute and we shall first consider this question, since if, as the petitioner contends, that contract was not completed within the meaning of the regulations until 1939, that fact alone is sufficient to preclude the inclusion of the profit therefrom in petitioner's income for 1938. *National Contracting Co.*, 25 B. T. A. 407; affd., 69 Fed. (2d) 252, and *C. F. Martin*, 34 B. T. A. 111. With respect to the Fredericks contract the evidence shows that the building had been completed prior to the close of 1938, but that because of certain minor defects in the workmanship, payment of the balance of $846.44 of the total contract price for construction was withheld for the purpose of adjustment with regard to such defects. Fredericks, the only witness called to testify concerning the condition of the building, stated that the matter of the defects was "ironed out" to his satisfaction in Janu-

---

[1] ART. 42-4. *Long-term contracts.*—Income from long-term contracts is taxable for the period in which the income is determined, such determination depending upon the nature and terms of the particular contract. As used in this article the term "long-term contracts" means building, installaion, or construction contracts covering a period in excess of one year. Persons whose income is derived in whole or in part from such contracts may, as to such income, prepare their returns upon either of the following bases:

(a) Gross income derived from such contracts may be reported upon the basis of percentage of completion. * * *

(b) Gross income may be reported for the taxable year in which the contract is finally completed and accepted if the taxpayer elects as a consistent practice so to treat such income, provided such method clearly reflects the net income. If this method is adopted there should be deducted from gross income all expenditures during the life of the contract which are properly allocated thereto, taking into consideration any material and supplies charged to the work under the contract but remaining on hand at the time of completion.

ary or February of 1939. There is no evidence whatever of the amount of labor or material, if any, used in correcting the defects or of the cost thereof; nor is there any evidence as to how the matter of the defects was "ironed out."

The regulations provide for the reporting of the gross income in the taxable year in which the contract is "finally completed." The word "completed," according to its definition in Webster's New International Dictionary, has the following meanings:

Filled up; with no part, item, or element lacking; free from deficiency; entire; perfect; consummate.

Brought to an end or to a final or intended condition; concluded; completed; as, the edifice is *complete*.

To bring to a state of entirety or perfection; to fulfill; finish; as to *complete* a task.

As these meanings embrace the element of finality, the use in the regulations of the word "finally" immediately preceding the word "completed" is redundant in that such use does not enlarge the meaning of that word, unless it is used for the purpose of distinguishing the cases falling within paragraph (b) of the regulations from those cases involving contracts which are partially completed and are covered by the preceding paragraph (a). This being so, we can eliminate consideration of the word "finally" as applied to the facts of this case. In so far as the term "completed" applies to contracts for the construction of buildings, we do not think the regulations were intended to require a completion within the ordinary meaning of the word as defined above any more than it was so intended by the courts in establishing the rule hereinafter quoted. With regard to building contracts, the courts have modified the rule requiring an absolute completion and strict performance of a contract before the right to payment thereon can be enforced. The rule is thus stated in 17 C. J. S., § 509, pp. 1087–1089:

The hardship of the rule requiring strict performance in order to permit recovery on a contract generally, when applied to a contractor who has undesignedly violated his contract, and the inequitable advantage that it gives to an owner who receives and retains the benefit of the builder's labor and materials have led to its qualification; and it is generally held that, where the compensation is due only on the performance of the contract, a literal and strict performance is not required, and if the builder, acting in good faith and intending and attempting to perform his contract, does so, he may recover the contract price, notwithstanding slight and trivial defects or deviations in performance, for which compensation may be made, in all its material and substantial particulars, by an allowance to the owner; but the owner is entitled to an allowance for the damages he may suffer by reason of the failure to perform strictly, such as the cost or expense of putting the structure or work in the condition called for by the contract; * * *

The rule is recognized in New Jersey where the contract in question was made and performed. *Bozarth* v. *Dudley*, 44 N. J. L. 304; *Feeney*

v. *Bardsley*, 66 N. J. L. 239; 49 Atl. 443; *White Door Bed Co.* v. *United States Mortgage & Title Guaranty Co. of New Jersey*, 146 Atl. 216 (N. J.); *Globe Home Improvement Co.* v. *Michnisky*, 120 N. J. L. 233; 199 Atl. 393. In the *Feeney* case the court approved an instruction given the jury by the lower court which was as follows: "If the contractor has substantially performed his contract, even though he has failed to do so in some minor particulars, he is entitled to recover the contract price, less what will be a fair allowance to the owner to make good the defects in the performance of the contract."

The facts in the present case clearly show that during the year 1938 the petitioner was, under the above rule of law, entitled to recover the unpaid portion of the contract price of the Fredericks building, subject to such allowance or set-off as might be shown to be proper for the repair of the minor defects complained of. There is nothing in the record showing, or tending to show, that the defects involved were occasioned by lack of good faith or lack of intention or attempt to perform its contract by petitioner so as to preclude application of the quoted rule. In our opinion, the regulations do not contemplate that a building contract which has been completed in all important particulars, except for minor defects, as was the Fredericks contract, shall be regarded as being uncompleted until such time as the minor defects may actually be corrected or adjustment made therefor. We hold that the Fredericks contract was finally completed in 1938 within the meaning of article 42–4 (b) of Regulations 101.

We are also of the opinion, and so hold, that the building under the Fredericks contract was accepted in 1938 within the intendment of the regulations. To overcome the determination of respondent that the Fredericks contract was accepted in 1938 petitioner relies solely on the testimony of Fredericks to the effect that he, in company with Day and the architect, made an inspection of the entire structure in February 1939 and, finding that the building complied with the contract, he, Fredericks, at that time accepted the building. This testimony is not in accord with Fredericks' position as disclosed in his letter of January 4, 1940, to his office employee stating that he had not "yet accepted the building." Even if it is material as to when Fredericks accepted the building, the theory of petitioner that it. was accepted in 1939 is not established by such directly contradictory testimony; nor could testimony of such unreliable nature overcome the determination of respondent that the building was. accepted in 1938.

However, we think it immaterial when Fredericks accepted the building. Reference to article 5 of the contract discloses that the parties contracted respecting the manner of the acceptance, leaving the decision as to the acceptability of the work and the full performance of the contract to the architect. That such a finding was made in September 1938 is indicated by the certificate of the architect au-

thorizing payment of $16,617.96 and stating the final sum thereafter due on the contract to be $1,846.44, which however was retained merely for purposes of final adjustment. In December 1938, $1,000 was paid, leaving a balance due for final adjustment of $846.44 on the total contract price of $159,923.72. The petitioner contends that the certificate was not a final certificate, for the reason that it shows on its face that the cost of the work under the contract and of the additions are shown to be lower than the amount stipulated by the parties. This discrepancy is one which it was within the power of the petitioner to explain, but it has failed to do so. It may be that the difference is due to the work performed by subcontractors. However this may be, the amount of the final payment retained for adjustment is identical with the amount which the parties stipulated as being unpaid on the entire contract as of September 27, 1938. The certificate of the architect was conclusive and it was a condition precedent to payment, unless waived. *Sargeant Bros.* v. *Brancati*, 151 Atl. 843 (N. J.); *MacDonnell* v. *Vitille*, 162 Atl. 738 (N. J.). It supports the respondent's determination that performance of the contract was accepted in the year 1938, and we sustain that determination.

On the question of the time of its completion there is no dispute in so far as the North End Hotel is concerned. The evidence shows, and the petitioner concedes, that it was completed on or about July 1, 1938, but petitioner contends that it was accepted in April 1939 and not in the year 1938.

We are of the opinion, and so hold, that the North End Hotel was accepted in 1938.

The evidence shows that the Ocean Grove Camp Meeting Association took possession of the hotel on or about July 1, 1938, and that from that date the building was continuously occupied and operated as a hotel, and that the entire contract price, except $2,035.33, was paid before the close of 1938. Nothing remained to be done on the contract after on or about July 1, 1938, and, so far as the record shows, the owner was entirely satisfied with the work and there was no controversy over any part of it. Thoma, manager of the owner, admitted there was no particular reason for withholding payment of the $2,035.33. These facts convince us that there was an acceptance of the work and the hotel in 1938, and we so hold. The petitioner's contention that acceptance occurred in 1939 is based on testimony to the effect that the building committee of the association inspected the work in April of that year and at that time accepted the building. The reason for the delay in making such inspection was said to be due to the fact that the committee was not scheduled to meet until April 1939 and that it preferred to wait until then so that it could ascertain whether the foundations were adequate to withstand the heavy seas of the winter season. In his testimony Thoma stated that

when the letters constituting the original contract covering the work on the hotel building, as distinguished from the work on the foundation, were written in April 1938 he had an oral understanding with Day that the inspection and acceptance would not be made until the following year because of the desire to see how the foundation would withstand the winter storms, but the unreliability of this testimony is indicated by the fact that the original contract did not call for any work on the foundation. The letter written by Thoma on January 9, 1941, indicates that the inspection by the building committee related to what the committee claimed was petitioner's obligation for maintenance of the foundation rather than to the acceptance by the committee of the work under the contract. Cf. *Vang* v. *Lewellyn*, 35 Fed. (2d) 283; *W. J. Scholl Co.*, 30 B. T. A. 993; *Mesta Machine Co.*, 12 B. T. A. 523; and *Uvalde Co.*, 1 B. T. A. 932. We find nothing in this evidence to support petitioner's contention that acceptance of the hotel building was in 1939.

Even if we should be in error in our finding that the two contracts in question were accepted in the year 1938, the petitioner nevertheless would not be entitled to report the income from those contracts in the year 1939. In *Rice, Barton & Fales, v. Commissioner*, 41 Fed. (2d) 339, a case in which the contract was completed and the contract price was collected in 1921, and the purchaser did not accept the subject matter of the contract until 1922, the court sustained the right of the contractor to account for the profit in the year of acceptance under regulations identical with those here involved. The taxpayer in that case was engaged in the business of manufacturing and selling specially designed machines under contracts which guaranteed the suitability of the machines for the purpose for which they were ordered. The machines were manufactured and shipped in units and were paid for upon delivery to the carrier, and they were subject to tests for correct mechanical operation after they were assembled at the plant of the purchaser. In connection with the tests and before acceptance by the buyer it was necessary for the taxpayer to make costly alterations and adjustments. Because of the nature of its business the taxpayer had consistently followed the bookkeeping practice of not entering its profit on any contract until the machine was actually accepted by the purchaser, or on a "finished or accepted contract plan." The court, after stating that the purchaser had the right to reject the machine within a reasonable time and that the taxpayer could not know whether the machine had been finally accepted until the buyer had made an inspection, said:

* * * In any event the petitioner had consistently kept its books on the theory that, until this right was exercised, the contract was not "completed and accepted" within the meaning of section 36 of * * * regulation 62. Therefore, in accordance with its established practice of bookkeeping, the petitioner was warranted in accounting for the profits of the contract in the year

1922. It cannot be said that such a method does not reflect the income of the petitioner whether accounted for in 1921 or 1922.

In the present case there is no proof that the petitioner accounted for its income in the year of acceptance by the other party to the contract. On the contrary, with respect to the petitioner's bookkeeping method, we are merely informed by the stipulation that the " method of keeping its books and reporting its gross income is on the basis of *completed* contracts." It is obvious that if the petitioner consistently accounted for its income from long term contracts as of the year of completion, as this language implies, there would be a distortion rather than a reflection of net income if it were now permitted to return the income from the two contracts in question in the year 1939, even if the contracts were accepted in that year.

The action of the respondent in including the profit from the two contracts in the petitioner's income for the year 1938 is approved.

The second and final issue is the proper allowance to be made for salaries of the petitioner's officers, Ehret and Day. The petitioner claimed a deduction of amounts actually paid to them—$8,000 to Ehret and $15,582.15 to Day. The latter amount included a payment of $1,602.15 in reimbursement of expenses of petitioner. The respondent allowed $11,582.15 and held that $12,000 of the claimed deduction was excessive, but his deficiency notice fails to reveal how much he determined to be a reasonable allowance as a salary for each officer. We are informed through his opening statement and brief that $2,000 was allowed for Ehret and $9,582.15 for Day, but, as the payment of $1,602.15 to Day admittedly was not for services actually rendered by him, we assume, for the purposes of decision, that the respondent allowed not more than $7,980 on account of Day's services. The question, therefore, is whether $2,000 and $7,980 constitute reasonable compensation for the services performed by Ehret and Day, or whether the petitioner has shown that such services were of greater value to it. The petitioner contends for an allowance of $8,000 with respect to Ehret and allowance of $13,980 with respect to Day.

Each of the officers in question testified as to the specific services rendered by him and to the time devoted to the business of the petitioner. All of the details are set forth in our findings of fact, together with facts concerning their experience in the business in which they were engaged, and they need not be here repeated. Our findings also contain other relevant facts. Upon due consideration of all of the evidence we are of the opinion that the services rendered by Day were reasonably worth the amount claimed by petitioner, namely, $13,980. With respect to the services rendered by Ehret, they were rendered on a part time basis and they involved a lesser degree of responsibility and participation in the business and in the results accomplished. Moreover, Day was a qualified construction engineer. We think

Ehret's services were worth more than $2,000, particularly in view of the amount of business handled by the petitioner and the fact that some of its contracts were obtained through Ehret's efforts. The evidence, in our opinion, shows that the respondent's allowance of $2,000 for Ehret's services is inadequate, and, upon due consideration, we have found as a fact that the services of Ehret were reasonably worth $5,000. Cf. *Cohan* v. *Commissioner*, 39 Fed. (2d) 540; and *Doernbecher Manufacturing Co.* v. *Commissioner*, 95 Fed. (2d) 296.

We hold that the petitioner is entitled to a deduction of $5,000 for salary paid to Ehret and a deduction of $13,980 for salary paid to Day, exclusive of the amount of $1,602.15 hereinabove mentioned.

*Decision will be entered under Rule 50.*