## GUY F. ATKINSON COMPANY OF CALIFORNIA AND SUBSIDIARIES, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8750–81.     Filed February 16, 1984.

---

*Toni Rembe* and *C. Douglas Floyd,* for the petitioners.
*Beatrice M. Pearson* and *Claire Priestley-Cady,* for the respondent.

STERRET, *Judge:* By notice of deficiency dated March 5, 1981, respondent determined deficiencies in petitioners' Federal income taxes as follows:

| TYE Dec. 31— | Deficiency |
|---|---|
| 1972 | $758,074 |
| 1973 | 15,368 |
| 1974 | 5,290 |
| 1975 | 3,414,988 |
| | 4,193,720 |

After concessions, the issues for decision are whether the proper year for reporting losses from the construction of a water tunnel where the contractor elected the completed contract method of accounting was 1975 or an earlier year and, if so, whether certain losses were allowable in the year of completion. The other issue for decision is whether one of the petitioners was a Western Hemisphere Trade Corporation in 1975.

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

The petitioners are the Guy F. Atkinson Co. of California (hereinafter GFA Co.), a California corporation, and subsidiary corporations which joined in the filing of consolidated returns for the calendar years 1972 through 1975. GFA Co.'s principal place of business was in South San Francisco, Calif., at the time the petition was filed. GFA Co. and its subsidiaries filed consolidated U.S. Corporation Income Tax Returns (Forms

1120) for the calendar years 1972 through 1975 with the Internal Revenue Service Center, Fresno, Calif.

## I. Losses From the Water Tunnel Project

### FINDINGS OF FACT

During the years at issue, the Guy F. Atkinson Co. (hereinafter Atkinson), a Nevada corporation, one of GFA Co.'s wholly owned subsidiaries, owned the Walsh Construction Co. (hereinafter Walsh), as a subsidiary. On December 31, 1970, Walsh merged into Atkinson, becoming a division of Atkinson for the remaining years at issue.

Walsh was the sponsoring and managing partner of the Water Tunnel Contractors (hereinafter WTC), a joint venture organized to construct a water tunnel (hereinafter the tunnel project) for the New York City (hereinafter city) water supply system. Walsh's interest in the profits, losses, and capital of WTC as of December 18, 1969, was 30 percent.

WTC filed U.S. Partnership Income Tax Returns for the calendar years 1970 through 1975 with the Director, Internal Revenue Service Center, Holtsville, N.Y., and the Director, Internal Revenue Service Center, Fresno, Calif.

During the years at issue, the Board of Water Supply of the City of New York (hereinafter the board) was a city agency responsible for developing the city's sources of water. The final authority respecting the use, development, and improvement of city land rested with the Board of Estimate (hereinafter BOE). Before the city could undertake capital projects, the BOE had to approve the standards, scope, and final designs of such projects.

On January 15, 1970, the board awarded three contracts (520, 521, 522) to WTC as low bidder for the construction of the first stage of a water tunnel. WTC treated these contracts and the formal change orders thereto as parts of a single contract for financial accounting and tax reporting purposes.

These contracts required the excavation and construction of about 13.7 miles of concrete-lined pressure tunnel, 25 access shafts, 3 large underground caverns (valve chambers), and related work. The contracts contained lump-sum items and unit price items. The lump-sum items included those items such as the construction of certain shafts for which WTC bid a

fixed amount. The unit price items were those for which WTC bid a certain price per unit of material installed or work performed such as per pound of structural steel installed. WTC's bid was thus a summation of prices for many items. For the three contracts, the bid totaled $228,605,810, less a discount of 2.63 percent if WTC received all three contracts, or $222,593,477.20.

Before receiving bids, the board issued documents to prospective bidders which contained estimates of the quantities of unit price items which the tunnel required. The documents indicated, however, that the bidders bore the obligation of substantiating these estimates and of bidding accordingly. Furthermore, the documents warned that the city would not pay an amount in addition to the total bid in the event the board underestimated the quantity of any item. The final contract incorporated the estimates of and amounts bid for each item. Under the terms of the contract, structural steel support was a separate unit price item, and the board estimated that the tunnel would require a total of 700,000 pounds of steel.

On February 6, 1970, the board gave WTC notice to start constructing the tunnel, and WTC began working on the tunnel that month. WTC immediately experienced significant delays and incurred expenses in excess of payments provided for in the contract.

The parties disputed the questions of whether WTC or the city was responsible for these delays and whether the city should bear the additional expense that WTC incurred in constructing the tunnel. Eventually, WTC installed structural steel in an amount far in excess of the estimate of 700,000 pounds, and incurred costs far in excess of the amount the city was willing to pay. In point of fact, by December 6, 1974, WTC had installed 18,543,182 pounds of structural steel, and of this amount, the board refused to approve or pay for 3,408,572 pounds.

WTC informed the board that its projected costs in building the tunnel exceeded its projected revenues under the contract, and WTC and the board entered two agreements modifying the contract on November 8, 1973, and July 22, 1974. Under these agreements, the board agreed to release a total of $7,200,000 of the retained percentages, which were amounts that the city

had withheld from the progress payments as per the contract in order to assure WTC's performance, and to advance an additional $3 million to WTC. In addition, WTC conveyed title to and liens in its construction plant, equipment, and facilities which were located or used at the tunnel construction sites to the city as security for the performance of the contract.

On November 9, 1974, the board and WTC agreed to a proposed supplemental agreement concerning the tunnel project, which the BOE never approved. Since the BOE did not approve the supplemental agreement at its December 5, 1974, meeting, WTC suspended all tunneling, excavation, and support operations, but continued to provide pumping and guard services at the construction sites. As a result of an interim agreement dated March 10, 1975, between WTC and the board, WTC agreed to resume work on the tunnel for 4 months. The interim agreement provided the scope of the work WTC would complete in this period, and the city agreed, inter alia, to pay WTC the costs incurred for work performed during this period. The agreement preserved the existing rights of both WTC and the city. WTC agreed to suspend prosecution of its legal action until 20 days after the expiration of the interim agreement, and the board agreed not to declare WTC in default during the terms of the agreement.

On May 19, 1975, Jacobs Associates, a firm which the city had hired as a consultant on the tunnel project, submitted a report which estimated that WTC could complete the tunnel for a cost of $264,079,892 and that another contractor could complete the project for $298 million. These figures excluded an allowance for profits. WTC's estimate for completing the tunnel at the time was about $370 million. A period of unsuccessful negotiation concerning completion of the tunnel project ensued between WTC and the city.

Since WTC and the city had failed to resolve their differences when the interim agreement expired, on July 7, 1975, with less than 60 percent of the tunnel project finished, WTC ceased all tunneling, excavation, and support operations, but continued to provide security and maintenance. On July 9, 1975, the board declared WTC to be in default and directed WTC to discontinue pumping and guard services and to surrender possession of the tunnel, shafts, chambers, construction site, materials, plant equipment, supplies, and all proper-

ty WTC provided for the purposes of the contract. WTC complied with this request on July 14, 1975, but protested the declaration of default. Following the abandonment of the sites, WTC moved all of its documents from New York to Connecticut and discharged all union personnel and most of the salaried personnel working on the tunnel. At that time, WTC personnel expressed the concern over losing the property which the city possessed pursuant to the default declaration. WTC was also concerned that the declaration would preclude members of the WTC joint venture from bidding on future work, as well as injure their credit.

On July 28, 1975, WTC filed a motion in the District Court for the Southern District of New York seeking a preliminary injunction rescinding the declaration of default and restraining the city from taking any action other than providing maintenance and insurance for the tunnel project and reletting the contract. Although WTC specifically stated that it did not want to prevent the city from reletting the contract, the city was concerned that a recision of its default declaration would have that effect.

Thereafter, WTC maintained that it was entitled to compensation for the assets which the city had possessed and insisted that the city maintain the equipment and consult WTC before selling any of the items. WTC further insisted that it be named insured under policies covering the tunnel project assets.

Settlement attempts involving WTC's resumption of work on the contract continued through the summer and fall of 1975 without success. The WTC management proposed a settlement offer on October 15, 1975, which offer was rejected. Although WTC's lawyers may have contemplated the idea of WTC's resumption of performance as late as April 1976, the WTC management concluded that there was no reasonable likelihood that WTC would resume performance following the city's rejection of the October 15, 1975, offer, and after November 1975, the management committee did not consider returning to work. The city, in motion papers dated September 12, 1975, stated that "The contractual relationship between [WTC] and [the City] is at an end." The city further stated "[WTC] will not be doing further work on this project by Court order or otherwise." On November 17, 1976, the city let Contract 520A which covered a portion of the work specified in the original

contract to another joint venture. Neither WTC nor any of its members submitted bids for this contract.

In its amended complaint dated September 9, 1975, WTC sought damages in the amount of $205 million arising from the excessive unanticipated costs it encountered in constructing the tunnel. In addition, it sought a recision of the default declaration, and the return to WTC of all property belonging to WTC which the city had seized in connection with the default declaration, or the payment of compensation for this property. WTC was seeking compensation for this property as late as June 14, 1976. On July 28, 1976, the U.S. District Court for the Southern District of New York denied WTC's request for a preliminary injunction. On January 18, 1977, WTC filed a second amended complaint which sought, inter alia, $217 million in damages or quantum meruit recovery, and recovery for all equipment, materials, or other property belonging to plaintiff and seized in connection with the default declaration.

The city in its answer to the second amended complaint dated July 13, 1977, asserted a counterclaim seeking a total of $369 million. The attorneys representing the city felt that if the parties proceeded to trail in this litigation, the city might suffer a liability of as much as $100 million.

Finally, on March 1, 1979, WTC and the city settled. The city paid $23,500,000 to WTC and rescinded its default declaration. The parties released all claims against each other arising from the contract and interim agreement.

For financial accounting purposes, WTC reported revenue and expenses attributable to the construction of the tunnel project on the percentage of completion method until March 31, 1973. At that time, the WTC management decided to change its accounting method for financial accounting purposes because of the excessive losses WTC was suffering. Following March 31, 1973, costs were recognized to the extent the city reimbursed them. The excess of costs over payments for this period was carried as an asset. Thus, in the financial report for 1973, the statement of income (loss) reflected an excess project cost of $15,812,602 for the period March 31, 1973, through December 31, 1973, and a project loss of $27,380,062, which WTC incurred during the period beginning with WTC's inception until March 31, 1973. In 1974, WTC increased its excess project cost of $15,812.602 by $28,296,870

to $44,109,472, and the project loss figure of $27,380,062 was increased by $8,500,000 to $35,880,062 as a provision for anticipated loss. In 1975, the WTC members decided that there was no present expectation that work under the tunnel contracts would resume because of the disputes between WTC and the city and because of the financial difficulties the city was suffering at the time. For this reason and because of accounting requirements resulting from the city's declaration of default and possession of the tunnel project construction sites and assets, the WTC management committee decided to stop treating WTC's disputed claims, including those involving physical assets, as assets in the financial statement on December 30, 1975. Thus, in financial reports for 1975, WTC's accountants wrote off the $35,609,472 remaining excess project costs which had been carried as an asset from 1974. They wrote off $29,694,909 in project losses which included $27,380,062 in losses that WTC incurred from its inception through March 31, 1973, and $2,314,847 in losses which WTC incurred in 1975. Also, WTC wrote down the project assets to realizable value which resulted in a loss on WTC's financial report of $23,225,737. Thus, the financial report reflected a net loss of $61,150,056 for the year 1975, and a net loss of $97,030,118 for the period beginning with WTC's inception through December 31, 1975.

WTC elected to use the completed contract method of accounting for reporting income and expenses arising from the construction of the water tunnel in its 1970 partnership return. WTC never received permission to change this method.

The 1973 WTC partnership return reflected an ordinary loss of $13,113,685. On their consolidated U.S. Corporation Income Tax Return for 1973, petitioners deducted their 30-percent distributive share of this ordinary loss, or $13,113,685. Petitioners thereafter agreed to respondent's disallowance of this deduction.

In its partnership return for 1974, WTC reported an ordinary loss of $28,362,292 and indicated that Walsh's 30-percent distributive share was $8,508,688. On their consolidated return for 1974, petitioners deducted $8,528,315 with respect to the tunnel project.

For 1975, WTC reported an ordinary loss of $69,331,882. WTC arrived at this figure by calculating the excess of direct

project costs for the life of the enterprise, or $217,537,597, plus the project shutdown writeoffs, or $23,225,737, over the gross receipts from the entire project or $143,069,160. The total net loss for the project was thus $97,694,174, but this figure was reduced by the $28,362,292 loss reported on the 1974 return, to arrive at $69,331,882. The following chart illustrates this computation.

| Income from operations | | From inception to Dec. 31, 1975 |
|---|---|---|
| Gross receipts | | $143,069,160 |
| Cost of operations: | | |
|   Direct costs | $120,274,124 | |
|   Depreciation and plant amortization | 27,269,688 | |
|   Overhead expense | 69,993,785 | 217,537,597 |
| | | (74,468,437) |
| Project shutdown writeoffs: | | |
|   Accounts receivable | (887,226) | |
|   Construction bond premium | (597,253) | |
|   Plant and utilities | (11,957,536) | |
|   Inventories | (2,401,735) | |
|   Deferred construction costs | (7,381,987) | (23,225,737) |
| Net income (loss) from inception to Dec. 31, 1975 | | (97,694,174) |
| Add back loss reported per tax return for calendar year 1974 | | 28,362,292 |
| Income (loss) from operations | | (69,331,882) |

WTC reported Walsh's 30-percent distributive share of the loss reported for 1975 as $20,799,565. However, on their consolidated return for 1975, petitioners deducted $21,829,891 with respect to the tunnel project.

Respondent does not dispute the gross receipts figure for WTC. Nor does respondent dispute the $217,537,597 "cost of operations" figure. However, respondent does contest the deduction of these losses in 1975 or any earlier year. In addition, in the event we find that either 1974 or 1975 is the year of completion of the contract, respondent disputes certain items comprising the $23,225,737 project shutdown writeoff. These items include—

(1) $11,957,536, which is the unamortized value on WTC's books of construction plant and utilities.

(2) $2,401,735, representing inventories which the city possessed pursuant to the July 9, 1975, default declaration.

(3) $2,950,552, which is the amount by which the cost to WTC of clad steel pipe and other materials purchased for installation in the tunnel exceeds the amounts which the city paid to WTC for these items.

(4) $758,735, a net amount representing the excess of $3,758,735 previously accrued but unpaid contract receivables ($3,197,874 of which represents contract retainages primarily in the form of tax-exempt bonds), over the $3 million unamortized balance of amounts that the city had advanced to WTC.

OPINION

The first issue for decision arising out of the foregoing facts is whether it was proper for WTC to report its losses from the tunnel project in 1975 or an earlier year, and thus whether petitioner properly reported their distributive share of the loss in such years.

WTC elected the completed contract method of reporting income and expenses. Pursuant to authority granted by Congress, sections 451 and 7805, I.R.C. 1954, the Secretary has promulgated regulations detailing the use of this accounting method. Section 1.451–3(d)(1), Income Tax Regs., provides:

under the completed contract method, gross income derived from long-term contracts must be reported by including the gross contract price of each contract in gross income for the taxable year in which such contract is completed (as defined in paragraph (b) (2) of this section). All costs which are properly allocable to a long-term contract (determined pursuant to subparagraph (5) of this paragraph) must be deducted from gross income for the taxable year in which the contract is completed. In addition, account must be taken of any material and supplies charged to the contract but remaining on hand at the time of completion.

The regulations further provide that "a long-term contract will not be considered 'completed' until final completion and acceptance have occurred." Sec. 1.451–3 (b) (2), Income Tax Regs. The regulations thus delay the deduction of expenses and the accrual of income arising from a long-term contract, where the taxpayer employs the completed contract method, until the year in which the contract is completed, and the subject matter of the contract, in this case the water tunnel, is tendered to the owner or buyer. This accounting method may

be a boon to the taxpayer whose long-term contracts prove profitable because it effectively delays accrual of income which the taxpayer would have reported in earlier years using other accounting methods. Unfortunately for a taxpayer whose long-term contract results in losses, as did WTC's, the completed contract method may prove to be a disadvantage because it delays the reporting of losses. In this case, petitioners' joint venture entered a terribly costly project losing approximately $75 million, considering the 1979 settlement, and its desire to deduct those losses in 1975, rather than later, is certainly understandable.

The first point of contention between petitioners and respondent is whether the contract was in fact completed in 1975 or earlier; the petitioners contend that it was, while respondent contends that it was not. Most of the case law interpreting the meaning of "completed" is not entirely apposite. These cases involve the question of whether the year for reporting income is the year in which the contractor literally completes the project or in a prior year when the contractor "substantially" completes the project. In *E. E. Black, Ltd. v. Alsup*, 211 F.2d 879 (9th Cir. 1954), the Court of Appeals for the Ninth Circuit interpreted the words literally and concluded that a taxpayer using the completed contract method of accounting could report income in 1945, when it installed the thermostats for the fire alarm system in the building it constructed and received the final payment of $533.50, rather than 1944 by which year the taxpayer substantially completed the building and received $44,000 of the contract price. *E. E. Black, Ltd. v. Alsup, supra* at 880. See also *Thompson-King-Tate, Inc. v. United States*, 296 F.2d 290 (6th Cir. 1961). This Court has held that income and expenses should be reported in the year of substantial completion even though the contract is not entirely completed and accepted until a later year, because the taxpayer was entitled to payment upon substantial completion of the contract and therefore had completed the contract for the purpose of the regulations. *Ehret-Day Co. v. Commissioner*, 2 T.C. 25, 32–35 (1943). In cases where this Court has held that contracts were substantially completed and thus completed for the purposes of the regulations, at least 98 percent of the

contract work had been performed.[1]

WTC in this case completed less than 60 percent of the contract work in 1975. However, it "terminated" performance in that year, and by the end of 1975, it appeared that WTC would not resume work under the contract. WTC encountered unforeseen circumstances in constructing the tunnel which resulted in costs which grossly exceeded payments as set forth in the contract. WTC attempted to renegotiate the contract with the city, but by the end of 1975, negotiations had failed and both WTC and the city realized that WTC would not resume. Indeed, WTC had abandoned the worksites and either laid off or transferred employees who were connected with tunnel construction. The city possessed the site and the equipment and supplies and by 1976, it began to contract portions of the tunnel construction to other parties. The issue is, therefore, whether the cessation of work coupled with the claims each party made against the other was tantamount to final completion and acceptance.

Petitioners rely upon the dispute provisions of the regulations to argue that in this case final completion is unnecessary because the dispute provisions govern in cases where a party ceases work under a contract after completing only a portion of the work. These provisions, section 1.451–3(d)(2), (3), and (4), Income Tax Regs., however, are inapplicable to the case because they involve cases where a contract, although not entirely completed, is substantially completed, and there are disputes between buyer and seller. At first blush, it might appear that section 1.451–3(d)(3), Income Tax Regs., headed "Contracts with disputes from taxpayer claims," is applicable because the city had not yet brought its counterclaim in 1975. Further, section 1.451–3(d)(4), Income Tax Regs., headed "Contracts with disputes from both buyer and taxpayer claims" might seem to apply because by 1977, the city entered its counterclaim against WTC. These regulations do not specifically say that the contract must be substantially completed. However, the examples which demonstrate the operation of the regulations make it obvious that these regulations do not apply in cases where midstream termination of performance

---

[1]See, e.g., *Wohlfeld v. Commissioner*, T.C. Memo. 1958–128 (loss from contract reportable in year was 98.26-percent completed).

occurs. Sec. 1.451–3(d)(3)(v), example (*1*), Income Tax Regs., provides—

S, a calendar year taxpayer utilizing the completed contract method of accounting, constructs a building for T pursuant to a long-term contract. Under the terms of the contract, S is entitled to receive $100,000 upon completion of the building. S finishes construction of the building in 1974 at a cost of $105,000. T examines the building in 1974 and agrees that it meets his specifications; however, as of the end of 1974, S and T are unable to agree as to the merits of S's claim for an additional $10,000 for certain items which S alleges are changes in contract specifications and T alleges are within the scope of the contract's original specifications. Under these circumstances, S must include in income in 1974 the gross contract price of $100,000 and must deduct from gross income in such year the $105,000 of costs. In 1975 the dispute is resolved by a payment to S of $2,000 with respect to his claim. S must include this $2,000 in gross income in 1975.

The example clearly points out that "S *finishes* construction of the building." The example indicates that the dispute provision does not apply until the building is completed. The examples illustrating section 1.451–3(d)(4), Income Tax Regs., both also consider situations in which the subject matters of the contract are completed. See sec. 1.451–3(d)(4)(ii), examples (*1*) and (*2*), Income Tax Regs. See also the examples under sec. 1.451–3(d)(2)(vii), Income Tax Regs.

In addition, the dispute provisions provide a method for calculating the income and expense to be reported in the year of contract completion. Regardless of which party to the contract is pressing claims, the starting figure is the "gross contract price." Sec. 1.451–3(d)(3)(ii), Income Tax Regs. If the contract involves disputes from taxpayer claims, that is, if the taxpayer claims an amount in addition to the gross contract price (sec. 1.451–3(d)(3)(i), Income Tax Regs.), then, in the year of completion, the taxpayer must include the entire amount of the gross contract price, without regard to the dispute, and deduct all costs which are properly allocable to the contract. Sec. 1.451–3(d)(3)(ii), Income Tax Regs. Any further income is included when the taxpayer's claim is resolved. Sec. 1.451–3(d)(3)(iii), Income Tax Regs. In the event of disputes from both buyer and taxpayer claims, the taxpayer must include in income the gross contract price reduced by the amount reasonably in dispute with respect to the buyer's claim, and must report expenses reduced by the amount by which the gross contract price was reduced. Sec.

1.451–3(d)(4)(ii), examples (1) and (2). The gross contract price means "the original stated price of the contract with any modifications to which the parties have agreed as of the end of the taxable year." Sec 1.451–3(d)(3)(iv), Income Tax Regs. In the instant case, the agreed upon figure for 1975 was approximately $220 million.

While it is true that the city had accepted only the portion of the work which WTC completed, and approved payment for this portion of the work, the gross contract price means the total price payable for the entire contract. Petitioners argue that the gross contract price means only the approximately $140 million paid and payable for the work completed because the total price was a summation of unit prices and prices for lump-sum items, and the city would pay for each unit or lump-sum item as it was constructed. However, this argument is inconsistent with the nature of a completed contract accounting method which provides for the reporting of all contract receipts in one accounting period. If, as petitioners suggest, the contract is severable into the components in this case, then petitioners should report the income and expense from each unit of the contract in the year of completion of such unit. This obviously is not how the completed contract method of accounting works.

Furthermore, if we applied the dispute provisions and used the entire price for work completed and to be completed under the contract, or approximately $220 million, as the gross contract price, we would reach an absurd result because in 1975 WTC had completed less than 60 percent of the work called for under the contract and was entitled to no more than this portion of the gross contract price. It would make no sense for the petitioners or WTC to report as income that portion of the contract price which had not yet accrued.

In holding that the dispute provisions do not apply to this case, we are left with the regulation containing the general rule and the case law. As noted above, the regulation requires "final completion and acceptance" of the contract before income and expenses are to be reported. Sec. 1.451–3(b)(2) and (d)(1), Income Tax Regs. A contract is "an agreement * * * to do * * * a particular thing." Black's Law Dictionary 394 (rev. 4th ed. 1968). The thing agreed upon herein was the construction of a water tunnel from the Bronx to Queens including

shafts, valve chambers, etc. The parties treated all of the agreements in respect of this tunnel as one contract. For accounting purposes, WTC treated these agreements as one contract through 1973, and for tax purposes, WTC and petitioners treated the tunnel contract as one contract. See, e.g., *National Contracting Co. v. Commissioner*, 25 B.T.A. 407, 411 (1932), affd. 69 F.2d 252 (8th Cir. 1934). Whatever may have happened in 1975, final completion of the thing agreed upon, that is completion of the water tunnel, as the regulations require, had not occurred. Concededly, WTC and the city could have truncated the contract such that the work completed by 1975 would have been all or substantially all of the work required under the contract, because a modification mutually agreed upon would have been the contract for tax purposes. See sec. 1.451–3(d)(3)(iv), Income Tax Regs.[2] However, WTC's unilateral decision to terminate performance followed by the city's possession of the tunnel and associated assets does not constitute a mutually agreed upon modification of the contract. The city's counterclaim in 1977 for breach of contract underscores this conclusion.

While our exhaustive research has revealed no case directly on point, there are cases that are instructive.[3] In one case, the Board of Tax Appeals decided that several agreements for the construction of two school buildings constituted one contract, and "that completion thereof required the discharge of the obligations undertaken in each of such contracts." *National Contracting Corp. v. Commissioner, supra* at 411.

In *Fort Pitt Bridge Works v. Commissioner*, 92 F.2d 825 (3d Cir. 1937), revg. 24 B.T.A. 626 (1931), the issue in part was whether a contract was terminated in 1918 followed by another contract, or whether there was only one contract. The contractor in this case had a contract with the Army to build hangars. The Army sent notice before the performance was completed that it was canceling all orders with respect to the

---

[2]See, e.g., *A. S. Wikstrom, Inc. v. Commissioner*, T.C. Memo. 1969–32.

[3]*National Contracting Co. v. Commissioner*, 37 B.T.A. 689, 701 (1938), affd. 105 F.2d 488 (8th Cir. 1939), is inapposite because as the Board noted:

"the petitioner's claim is not disputed that contract 53 was completed so far as the petitioner was concerned in 1919 and was so treated. It is not, therefore, necessary for us to consider whether the petitioner might, under the completed contract method of accounting and in accordance with a consistent practice, have treated [the] contract as open until all claims arising out of it were settled.* * *"

hangars. The contractor then notified the Army that it was complying with these instructions. Thereafter, the Army informed the contractor of its decision not to cancel the contract and in fact ordered the contractor to ship a portion of the hangars originally ordered. The Court of Appeals for the Third Circuit held that on these facts, the Government had canceled the contract and that the petitioner or contractor impliedly agreed to such cancellation. Therefore, the contract was terminated, and for tax purposes was completed. *Fort Pitt Bridge Works v. Commissioner, supra* at 828–829. Thus, it appears that one party to a contract may not unilaterally withdraw from a contract even for bona fide financial reasons, and consider the contract complete for tax purposes. In other words, WTC may not accelerate the deduction of costs incurred in fulfilling the obligations under the contract by terminating performance and suing for a quantum meruit recovery. The other party must consent to such withdrawal in order to truncate the contract such that it may be considered completed and the taxpayer's obligation performed. Here, there is no indication that the city consented to WTC's cessation of performance in 1975. It appears that the city, far from consenting to WTC's cessation of work, took all steps that it could to have WTC comply with the contract obligations by declaring it in default, enforcing its security agreements, and counterclaiming for breach of contract. Thus, at the end of 1975, WTC still had unfulfilled obligations under the contract which had not been fulfilled by performance, or avoided by agreement or injunction.

In sum, petitioner would have us hold that a long-term contract is completed when the contractor has terminated its performance (whenever that might be) under the contract. We do not believe that the law permits one party to determine unilaterally when a contract has been fulfilled. While we do not say that the last nail must be driven, we do say, as the regulations imply, that the contract must be substantially physically completed before the long-term method of accounting becomes operative. We do not need to define "substantially" precisely since here petitioners had completed less than 60 percent of the contract, far short of any reasonable definition of the term "substantial completion."

An additional reason prevents us from concluding that WTC could report its income and expenses from the contract in 1975 or earlier. That is, since we have decided that the dispute provisions do not apply to this case, specifically section 1.451–3(d)(3), Income Tax Regs., the case law requires that where a long-term contract winds up with claims such as those involved in this case, an entity must defer reporting income and expenses until such time as it can determine whether the contract will result in a net gain or a net loss. In *C. H. Leavell & Co. v. Commissioner*, 53 T.C. 426, 438 (1969), the Court noted that "the outcome of a pending dispute may involve such a substantial amount as to make ascertainment of the contract results in terms of gain or loss impossible, and thereby justify a delay in reporting any of the contract income."[4] See also *Smith v. Commissioner*, 66 T.C. 213, 219 (1976); *Carolina Contracting Co. v. Commissioner*, 32 B.T.A. 1171, 1176 (1935).

In this case, in 1975, WTC was suing the city for an amount in excess of the net loss WTC claimed it suffered from the tunnel project. WTC also sought compensation for or recovery of the items the city had possessed upon declaring WTC in default. Moreover, the city had not yet asserted its counter-claims in 1975. Thus, in 1975, it was not possible to tell whether WTC ultimately would suffer a loss or enjoy a gain.

We recognize that our decision that 1975 is not the year of contract completion precludes the deduction of the project shutdown writeoffs in any of the years at issue. However, additional reasons compel us to deny the deduction of this particular item. With respect to the project shutdown write-offs, petitioners contend that the value of some of these properties including the clad steel pipe and structural steel, inventories, and the construction plant and utilities was minimal because these items had been manufactured according to unique specifications and upon resale would have value only as scrap. Initially, we note that petitioners did not present any evidence as to the value these assets might have had to a contractor replacing WTC on the Tunnel Project.

---

[4] *B & H Construction & Supply Co. v. Commissioner*, T.C. Memo. 1978–195. In this case, petitioner had outstanding claims for work done under contract such that it could not be known during the year at issue whether petitioner would ultimately have a gain or loss on the contract. Therefore, the Court could not find that petitioner had sustained a deductible loss.

In addition, the evidence indicates that WTC had not installed these materials, such as clad steel pipe and structural steel, in the tunnel by the end of 1975. Even assuming 1975 to be the year of completion, the regulations require that "account must be taken of any material and supplies charged to the contract but remaining on hand at the time of completion." Sec. 1.451–3(d)(1), Income Tax Regs. This means that in order to deduct the cost of these materials in 1975, they must have "become an integral part of the subject matter of the long-term contract and those materials which are consumed in the ordinary course of building [or] constructing * * * the subject matter of a long-term contract." Sec. 1.451–3(d)(5)(i), Income Tax Regs.[5] Since the materials in question were neither consumed nor installed, their cost would not be deductible even assuming 1975 as the year of completion.

In respect of $758,735 excess of previously accrued contract receivables over the unamortized amount of city advances to WTC, the amounts comprising the receivables consisted of several items. One item was "due for current estimate" in the amount of $95,002. This item had been submitted to the city on an estimate, but the city disputed this item and did not pay it. Assuming 1975 was the year of completion, this item would not be included in income because disputed items such as this are not included until the dispute is resolved (*Smith v. Commissioner*, 66 T.C. 213, 218–219 (1976)). See, e.g., sec. 1.451–3(d)(2)(iii), Income Tax Regs. The $513,858 item "due for unbilled work" related to work which was performed but for which WTC had not yet submitted an estimate to the city. This appears to be further evidence that the contract was not completed as of 1975. Obviously this portion of the contract work had not yet been accepted as required by both the regulations (sec. 1.451–3(b)(2), Income Tax Regs.), and the case law. *Martin v. Commissioner*, 34 B.T.A. 111, 116 (1936). While this is an insignificant amount of work compared to the entire contract and might not prevent completion under this Court's

---

[5]While the regulation was promulgated in 1976, T.D. 7397, 1976–1 C.B. 115, we note that the Secretary's regulations are to be retroactive unless otherwise indicated (sec. 7805 (b)). See, e.g., *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 135 (1936), affg. 76 F.2d 892 (2d Cir. 1935),. and 29 B.T.A. 395 (1933); *Pollack v. Commissioner*, 392 F.2d 409 (5th Cir. 1968), affg. 47 T.C. 92 (1966).

substantial completion test rather than the Ninth Circuit's test, under the circumstances where over 40 percent of the contract was uncompleted in 1975, this item is merely another indication that the contract was still incomplete. Nevertheless, if 1975 were the year of completion, it appears that the item should be included in WTC's income because there was no dispute with respect to it. The final items were retainages. There is no indication that in 1975 these amounts were in dispute, and the mere fact that the city withheld payment of these retainages does not prevent their inclusion and does not justify their deduction even assuming 1975 was the year of completion. See, e.g., *Orino v. Commissioner*, 34 B.T.A. 726, 730–731 (1936).

In respect of the items comprising the writeoff and which the city possessed pursuant to the default declaration, the fact remains that as of the end of 1975, WTC was suing to recover the items. Even assuming 1975 to be the year of completion, WTC may not take a deduction for these items. As noted above, WTC had not used or completely depreciated these items in the course of completing the tunnel, and therefore could not take deductions for these items as expenses or losses attributable to the contract. Otherwise, as respondent suggests, WTC must rely upon section 165[6] to justify the deduction. Section 1.165–1(d)(2)(i), Income Tax Regs., provides—

If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim. When a taxpayer claims that the taxable year in which a loss is sustained is fixed by his abandonment of the claim for reimbursement, he must be able to produce objective evidence of his having abandoned the claim, such as the execution of a release.

---

[6]Sec. 165(a) provides:

SEC. 165(a). GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or ⁓therwise.

On the facts of this case, WTC was suing the city to obtain a recision of the default declaration and to recover the assets seized pursuant to the declaration, and to obtain compensation for the assets. As of 1975, it appeared that WTC might expect a recovery with respect to these assets; certainly WTC expended great sums in pursuing its litigation, and it does not appear that this litigation was "specious, speculative, or wholly without merit." See *Scofield's Estate v. Commissioner*, 266 F.2d 154, 159 (6th Cir. 1959), revg. in part 25 T.C. 774 (1956). See also *Kugel v. Ryan*, 289 F.2d 329, 330 (2d Cir. 1961).[7] Thus, since it appears that as of the end of 1975, there was a reasonable likelihood that WTC would recover the amounts in respect of these items[8] comprising the project writeoff, 1975 would not be the proper year for deducting those amounts as losses even assuming it was the year of contract completion. Accordingly, we hold that neither 1975 nor any earlier year was a proper year for deduction of the tunnel project losses.

## II. Western Hemisphere Trade Corporation Deduction

### FINDINGS OF FACT

Atkinson-International Dominican Republic (hereinafter AIDR), formerly know as Walsh-WHTC, Inc., was a member of petitioners' consolidated return group for 1975. AIDR's primary business during 1975 was the construction of the Sabana Yegua Dam (hereinafter the dam) and related activity for the government of the Dominican Republic, near the city of San Juan de la Maguana in the Dominican Republic. The basic components of the dam were the earth dam, a surface spillway, the bottom outlet of two tunnels, a tunnel intake, and a hydroelectric plant. In constructing the dam, AIDR had to perform various tasks including land clearing; river diversion and water control; open cut excavation; embankment fill; grouting (concrete filling) and related drillings; pouring concrete for foundation; installation of reinforcing steel and miscellaneous features; masonry; laboratory testing; underground excavation and installation of tunnel access shafts and

---

[7]See *Singleton v. Commissioner*, T.C. Memo. 1977-98, affd. 606 F.2d 50 (3d Cir. 1979).

[8]It would appear that sec. 166 would apply to the contract receivables. However, since there was a reasonable prospect of recovery with respect to these items in 1975, a deduction for the receivables in 1975 would be improper.

tunnel gates; construction of ancillary buildings; compaction of fill; preparation of access roads; installation of fences and gates; and transportation, erection, and testing of an electrical powerhouse, hydricsanitary facility, and mechanical and electrical equipment. In addition, the contract for the construction of the dam required AIDR to supply all the materials required for the satisfactory completion of the Dam, including satisfactory fill material, concrete, cement, reinforcing steel, and iron. In addition, AIDR provided such items as sliding and wheel gates, a butterfly valve, turbines, generators, and transformers.

AIDR reported its income from its construction activity using the percentage of completion method of accounting. In their consolidated return for 1975, petitioners reported AIDR's income as follows:

| | |
|---|---|
| Gross receipts | $16,228,166.00 |
| Cost of operations | 15,410,271.16 |
| Gross profit | 817,894.84 |
| Other interest | 517,543.00 |
| Other income | 3,231.00 |
| Total income | 1,338,668.84 |
| Other deductions | 5,974.00 |
| Taxable income | 1,332,694.84 |

## OPINION

The issue for decision is whether AIDC qualified as a Western Hemisphere Trade Corporation (WHTC) for the year 1975. The law as in effect for that year[9] allowed a deduction for a WHTC in calculating its taxable income in accordance with a formula set forth in section 922 if a corporation qualified under tests set forth in section 921. Section 921 provides—

For purposes of this subtitle, the term "Western Hemisphere trade corporation" means a domestic corporation all of whose business (other than incidental purchases) is done in any country or countries in North, Central, or South America, or in the West Indies, and which satisfies the following conditions:

[9]The allowance of a deduction for WHTC's was repealed by sec. 1052, Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1647.

(1) if 95 percent or more of the gross income of such domestic corporation for the 3-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources without the United States; and

(2) if 90 percent or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business.

In the case of AIDR, there is no dispute with respect to how much gross income it earned from sources within the United States or from something other than the active conduct of a trade or business. Nor is there any dispute that the gross income earned from the construction of the dam would be qualifying gross income for the purposes of section 921. However, in order for AIDR to satisfy the section 921 tests, that is for its gross income from the dam to at least equal 95 percent and 90 percent of its entire gross income for the purposes of section 921(1) and (2), respectively, the gross income must be equivalent to the gross receipts from the dam. If AIDR's gross receipts are reduced by cost of goods sold or of operations, in arriving at gross income, as respondent contends, AIDR would fail both the section 921(1) and (2) tests and lose the section 922 deduction. Simply stated, the issue for our decision is whether AIDR's gross income from constructing a dam equals its gross receipts, or gross receipts less cost of operations, for the purposes of section 921(1) and (2).

Neither section 921 nor the regulations thereunder provide a definition of gross income. However, AIDR reported its income from the dam using the percentage of completion method, and the regulations pertaining to this method are most helpful.

Under the percentage of completion method, the portion of the *gross contract price* which corresponds to the percentage of the entire contract which has been completed during the taxable year must be included in *gross income* for such taxable year. [Sec. 1.451–3(c)(1), Income Tax Regs. Emphasis added.]

Further—

Under the percentage of completion method, all costs incurred during the taxable year with respect to a long-term contract (account being taken of the material and supplies on hand at the beginning and the end of the taxable year for use in the contract) must be *deducted*. [Sec. 1.451–3(c)(3), Income Tax Regs. Emphasis added.]

The regulations clearly indicate that the portion of the gross contract price, which AIDR reported as gross receipts, is gross income, and that the costs are to be deducted. It is clear that while cost of goods sold is offset against gross receipts in the computation of gross income, deductions are subtracted from gross income in arriving at taxable income. *Curtis Gallery & Library, Inc. v. United States*, 388 F.2d 358, 361 (9th Cir. 1967); *B. C. Cook & Sons, Inc. v. Commissioner*, 65 T.C. 422, 428-429 (1975), affd. 584 F.2d 53 (5th Cir. 1978). Thus, it would seem that AIDR's gross receipts, computed under the percentage of completion method, must be equivalent to gross income from which the costs are deducted in arriving at taxable income.

We are cognizant of the regulations under section 61 which provide—

In a manufacturing, merchandising, or mining business, "gross income" means the total sales, less the cost of goods sold, plus any income from investments and from incidental or outside operations or sources. * * * [Sec. 1.61-3(a), Income Tax Regs.]

Is the construction of a dam equivalent to manufacturing, merchandising, or mining, or to something else, such as services?

We note that whether an item is subtracted from gross receipts to arrive at gross income, or is deducted from gross income to arrive at taxable income, usually makes no difference because the figure upon which tax is imposed, taxable income, will remain the same in either case. See, e.g., R. Magill, Taxable Income 363 (1945). However, in some instances, as in this case, the amount of gross income is as important because certain sections of the Code rely upon gross income as a ceiling or as an aid in definition.

An example of this is section 151 which allows as a deduction an exemption for a dependent whose gross income for the year is less than $1,000. Sec. 151(e)(1)(A). In *Hahn v. Commissioner*, 30 T.C. 195 (1958), affd. 271 F.2d 739 (5th Cir. 1959), this Court considered section 25(b)(1)(D) of the 1939 Code which provided for an exemption for each dependent whose gross income was less than $600. *Hahn v. Commissioner, supra* at 197. In that case, the taxpayer claimed an exemption for his father who operated a blacksmith and welding shop. The issue was whether the father's gross income was equivalent to the

gross receipts of the business, or the gross receipts less cost of goods sold. Although the father made some parts for farm machinery, he "was primarily engaged in repairing plows, trailers, combines, and other types of farm equipment." *Hahn v. Commissioner*, *supra* at 196–197. This Court held that gross income equaled gross receipts because "what [the father] was selling, for the most part at least, was not a material product to which direct costs could be allocated as in the case of a manufacturing business, but rather * * * services, consisting of his ability, know-how, and experience as a blacksmith and welder in the repair and maintenance of farm machinery and equipment." *Hahn v. Commissioner*, *supra* at 198. Thus, where a business is engaged primarily in the providing of service, rather than mining, manufacturing, or merchandising, the business gross receipts will constitute gross income.[10]

In this case, while AIDR did in fact construct a dam and related structures, its function was primarily performing a service rather than mining, manufacturing, or merchandising. AIDR did not build many dams at one location and ship one to the site in the Dominican Republic. Nor did it construct the dam from a standard set of plans. See, e.g., *Pope v. Commissioner*, T.C. Memo. 1965–211. Rather, this was an onsite construction of a unique item specifically designed and constructed in accordance with geological and environmental considerations particular to that site and to serve the particular purposes demanded by the buyer.

We hold that, for the foregoing reasons, AIDR was furnishing services. Accordingly, we hold that AIDR is entitled to a WHTC deduction for the year 1975.

*Decision will be entered under Rule 155.*

---

[10]Other cases wherein this Court has required the subtraction of costs of goods sold from gross receipts involved the production of milk, cream, and butter by a dairy farm. *Garrett Holding Corp. v. Commissioner*, 9 T.C. 1029, 1034–1035 (1947); *Woodside Acres, Inc. v. Commissioner*, 46 B.T.A. 1124 (1942), affd. 134 F.2d 793 (2d Cir. 1943).